In the

# United States Court of Appeals
### For the Seventh Circuit

No. 10-3964

GEORGE H. RYAN SR.,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 5512—**Rebecca R. Pallmeyer**, *Judge*.

On Remand from
the Supreme Court of the United States

ARGUED JULY 20, 2012—DECIDED AUGUST 6, 2012

Before EASTERBROOK, *Chief Judge*, and WOOD and TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. George Ryan, formerly Secretary of State and then Governor of Illinois, was convicted of violating RICO (the Racketeer Influenced and Corrupt Organizations Act), the mail-fraud statute,

the Internal Revenue Code, and a law forbidding lies to federal investigators. His convictions and sentence were affirmed on appeal. *United States v. Warner*, 498 F.3d 666, rehearing en banc denied, 506 F.3d 517 (7th Cir. 2007), cert. denied, 553 U.S. 1064 (2008).

The judge told the jury that it could convict Ryan of mail fraud if he either accepted bribes or concealed receipt of payments that created a conflict of interest. The theory behind the second method of conviction was that the state had an intangible right to Ryan's honest services, and that secret payments interfered with the state's enjoyment of that right even if Ryan did not take the money in exchange for decisions over which he had control on behalf of the state. The instructions were accurate statements of the law under 18 U.S.C. §1341 and §1346, as this court understood the mail-fraud offense at the time. See *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998). But in *Skilling v. United States*, 130 S. Ct. 2896, 2932–33 (2010), the Supreme Court disagreed with *Bloom*. It held that only bribery or kickbacks can be used to show honest-services fraud. *Id*. at 2931.

Ryan then asked for collateral relief under 28 U.S.C. §2255. He did not contest the lying or tax convictions but did challenge the mail-fraud and RICO convictions. RICO makes it a crime to operate an organization (here, the state of Illinois) through a pattern of predicate crimes. 18 U.S.C. §1962(d). The indictment alleged that mail frauds constituted the predicate crimes; thus a defect in the mail fraud convictions could vitiate the RICO conviction as well. The United States agreed with

Ryan that his petition was timely—waiving any defense under §2255(f)—and did not contend that there is any difference between the sort of review available on a petition under §2255 and the kind available on direct appeal. *Skilling* arose on direct appeal, and the Court remanded with instructions to determine whether the error was harmless. 130 S. Ct. at 2934. See also *Black v. United States*, 130 S. Ct. 2963, 2970 (2010). Ryan asked the district court to engage in harmless-error analysis under §2255 as well. The United States did not disagree with Ryan that a harmless-error inquiry was appropriate, though it stoutly argued that the error was indeed harmless—as the district court held in a thorough opinion. 759 F. Supp. 2d 975 (N.D. Ill. 2010).

At oral argument this court questioned whether the same standard should be used on direct appeal and collateral attack. We directed the parties to file supplemental memoranda concerning that subject. Once again the United States failed to contend that the standards differ. We concluded, however, that the standards are materially different, and that on collateral review the appropriate question is whether the evidence was sufficient to convict under the correct instructions. We held that the record contains more than enough evidence to convict Ryan under the legal standards articulated in *Skilling* and affirmed the district court's decision. 645 F.3d 913 (7th Cir. 2011).

The Supreme Court held Ryan's petition for certiorari until it decided *Wood v. Milyard*, 132 S. Ct. 1826 (2012), which presented questions concerning a court's power,

in a case concerning collateral review of a criminal conviction or sentence, to decide an appeal on a ground that the prosecutor did not advance. The opinion in *Wood* articulates several conclusions: (1) that a court of appeals is entitled to deny collateral relief on a procedural ground that the prosecutor has forfeited by overlooking it, but not on a ground that the prosecutor has waived; (2) that the power to decide an appeal on a forfeited ground should be used only in exceptional cases; and (3) that a prosecutor's considered decision to refrain from raising a known procedural issue is waiver. The Court then remanded Ryan's case with instructions to reconsider in light of *Wood*. 132 S. Ct. 2099 (2012). We received position statements from the parties, see Circuit Rule 54, and the appeal was reargued.

The United States asks us to reinstate our decision of last year, telling us that, no matter what it said in the memorandum filed after the first argument, it *now* agrees with everything we wrote about the difference between direct appeal and collateral review under §2255. It maintains that the post-argument memorandum of 2011 forfeited, and did not waive, the legal principles addressed in our opinion. The gist of the United States' position in 2012 is that it just didn't realize what a strong procedural argument it had in 2011 and would have asserted it vigorously had its lawyers then been more astute. That does not distinguish our situation from *Wood*, however; there, too, the state's lawyers adopted the court of appeals' position after finally waking up to the strength of the procedural defense.

The Supreme Court found a waiver in *Wood* because the state knew about a potential defense and told the court that it was not asserting it. That's exactly what happened here. The United States Attorney learned at oral argument that there was a potential procedural argument, then informed the court that the argument was not being asserted. Why a litigant comes to such a decision is irrelevant, and a mistake in reaching a decision to withhold a known defense does not make that decision less a waiver. This court is neither authorized nor inclined to delve into the deliberational process that preceded a decision by the United States Attorney; we must respect the decision announced in court. See, e.g., *In re United States*, 398 F.3d 615 (7th Cir. 2005); *United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004). We therefore turn to the harmless-error inquiry, framed as if this were a direct appeal.

This does not mean that we *have* a direct appeal; the real direct appeal was resolved in 2007. Ryan was sentenced to 78 months in prison on one RICO count. This is the only sentence he is still serving. All of the others—60-month sentences on seven mail-fraud convictions, 60-month sentences on three false-statement counts, and 36-month sentences on four tax counts—ran concurrently with each other and with the RICO sentence, and all have expired. Section 2255 allows a person to contest ongoing imprisonment, and it is the single RICO sentence that underlies Ryan's imprisonment today. The jury was told that, to convict Ryan on the RICO charge, it had to find a pattern of criminality including at least two acts of criminal mail fraud. The

jury convicted Ryan on seven mail-fraud counts, so if at least two of these are valid after *Skilling* then the RICO conviction is valid as well.

Ryan's challenge to expired sentences may or may not be moot as a technical matter. A collateral attack begun while custody continues can continue afterward to stave off collateral consequences. See *Spencer v. Kemna*, 523 U.S. 1, 7–14 (1998). Ryan has not identified any collateral consequences of the mail-fraud convictions (such as deprivation of the right to vote or hold office) that would not equally be required by the RICO conviction—not to mention the three false-statement convictions and the four tax convictions, which have not been challenged. Even on direct appeal, courts are free to pretermit decision about convictions producing concurrent sentences, when the extra convictions do not have cumulative effects. As a practical matter, the concurrent-sentence doctrine was abrogated for direct appeal when Congress imposed a special assessment of $50 (now $100) for each separate felony conviction. See *Ray v. United States*, 481 U.S. 736 (1987); 18 U.S.C. §3013(a)(2). A collateral attack under §2241, §2254, or §2255 contests only custody, however, and not fines or special assessments.

An attempt to decide on collateral review whether *each* of the seven mail-fraud convictions was valid would smack of an advisory opinion—something that no waiver, however deliberate, can authorize. Ryan has not argued that the district judge would have given a lower sentence on the RICO count had she believed, say, that

only four of the mail-fraud convictions represented bribes, and the other three represented undisclosed conflicts of interest. After all, a district judge may base a sentence on established misconduct whether or not that misconduct has led to a conviction. We therefore do not think that *Wood* poses an obstacle to confining our attention today to the validity of the RICO count, though we add that, before Ryan's mail-fraud sentences expired, the district judge gave careful consideration to each of the seven and found all of them valid after *Skilling*.

The district judge told the jury that it could find criminal mail fraud (for purposes of both RICO and the seven stand-alone charges) if it found either (a) that Ryan took bribes (private payment for official services rendered, where the payment was designed to influence those official acts) or (b) that Ryan accepted undisclosed payments that created a conflict of interest, even though he did not do anything in exchange. The first possibility survived *Skilling*, and the second did not. Ryan maintains that the jury may have convicted him on (b) alone. Whenever the law changes in this fashion after a jury's verdict, it is difficult to reconstruct what would have happened if the instructions had been different; the judge's and the litigants' understanding of the law at the time is bound to influence how they present and argue a case, as well as how the jury evaluates it. But *Skilling* and *Black* said that harmless-error analysis remains possible, so we must reconstruct as best we can.

Mail-fraud convictions were reaffirmed on remand in both *Skilling* and *Black*. See *United States v. Skilling*,

638 F.3d 480 (5th Cir. 2011); *United States v. Black*, 625 F.3d 386 (7th Cir. 2010). Like the district judge, we conclude that at least two of them remain valid for Ryan too, in the strong sense that the jury *must* have found bribery and not just a failure to disclose a conflict of interest. We have three principal reasons.

First, Ryan was convicted on four tax counts, which involved omitting income from tax returns. Bribes are "income" under the Internal Revenue Code; gifts from friends are not income. The jury was so instructed. The jury also was told that it should acquit Ryan if he believed that the money he received was a gift, rather than a payment for favors delivered in return, even if his belief was wrong. By convicting on the tax counts, the jury found that Ryan knowingly accepted payment in exchange for official acts—that he was bribed, rather than just that he failed to disclose gifts to the public.

Second, both sides argued this case to the jury as one about bribery. The prosecutor produced evidence that Lawrence Warner, Ryan's co-defendant, provided him and his family with extensive benefits. The district judge summarized:

> [T]he benefits flowing from Warner to Ryan in-
> cluded favorable construction and insurance
> benefits to Ryan's family members; investments
> in Ryan's son's business; and favorable financial
> treatment of Comguard, a business involving
> Ryan's brother. As Ryan himself notes, Warner
> wrote a $3,185 check to pay for the band that
> played at Ryan's daughter's wedding and held

> two major fund-raisers for Ryan, raising a total
> of $250,000. The government also provided cir-
> cumstantial evidence that Ryan received cash
> from Warner and others.

759 F. Supp. 2d at 997–98 (citations to the record omitted). These payments underlay three of the mail-fraud convictions (Counts 2, 3, and 8). Ryan's lawyers vigorously argued that these benefits were tokens of friendship, and that he did nothing in return for them. If some of his acts assisted Warner, or Warner's associates, that happened only because Ryan concluded in the exercise of independent judgment that the public interest required the actions favorable to Warner. The prosecutor might have replied that, even if that was true, the jury still should convict because Ryan did not disclose the payments. But that's not what the prosecutor argued. He told the jury that it needed to find that Ryan received improper "benefits"—and in context these references to "benefits" meant "bribes." In other words, the prosecutor did not try to take advantage of the portion of the instructions that *Skilling* later disapproved. Both prosecution and defense presented this case to the jury as a dispute about whether Ryan took bribes. The verdict shows that the jury found in the prosecution's favor.

The line of reasoning in the preceding paragraph persuaded the district judge—who also conducted the six-month trial and thus had the best perspective on what practical issues influenced the verdict—as it also persuades us. Ryan maintains, however, that the pros-

ecutor did not set this up as a binary choice: find bribery and convict, or find gift (or mistake) and acquit. The prosecutor told the jury that it did not need to find a quid pro quo in order to convict. And that, Ryan maintains, means that the prosecutor was arguing that the jury could convict based on secrecy rather than bribery.

We think that this misunderstands what the prosecutor meant by "quid pro quo." A dispute developed at trial about whether the prosecution had to show that a particular payment from Warner to Ryan matched a particular decision that Ryan made to confer benefits on Warner. The prosecutor denied that matching was necessary and contended that taking money in exchange for a promise (explicit or reasonably implied) to deliver benefits in return is bribery; it isn't necessary to show that Warner's paying for the band at the wedding could be matched against a particular decision Ryan made in exchange. The district judge told the jury that the prosecutor was right about this. Thus when the prosecutor denied that it was necessary to show a quid pro quo, he was not arguing that it was unnecessary to show bribery; he was arguing that Ryan's lawyers had defined bribery too narrowly. This aspect of the prosecutor's argument did not invite a conviction based on nondisclosure, rather than the receipt of bribes.

Our third principal reason for finding the error in the jury instructions harmless comes from analysis of the arguments pro and con about particular counts. What we have said so far is general, but there were detailed submissions to the jury on each mail-fraud count (and

thus on each potential predicate crime under RICO). We agree with the district judge's analysis. Rather than restate it, we reproduce the discussion concerning Count 2, the first of the mail-fraud counts (759 F. Supp. 2d at 998–99; citations omitted):

Count Two of the indictment charged that the mailing of a check from the State of Illinois to American Detail & Manufacturing Co. ("ADM") was in furtherance of the scheme to defraud. The evidence at trial showed that Ryan intervened on Warner's behalf in order to get James Covert, head of the Secretary of State's vehicle-services division, to withdraw contract specifications that might have caused ADM to lose a valuable vehicle registration stickers contract. At the time, ADM was Warner's client, and prior to Ryan's direct intervention, Warner represented to Covert that he had "authority to speak for Secretary Ryan" and wanted ADM to retain the contract.

In ruling on the sufficiency of the evidence in support of this count, the court noted that jurors had been instructed that if Ryan had acted in good faith—he claimed that his instructions to Covert were motivated by legitimate law-enforcement concerns—they should not convict him on this count. The jurors convicted Ryan despite this instruction, and the court observed that "Ryan's direct intervention on Warner's behalf, and his attempt to conceal his intervention by directing Covert to withdraw the specifications quietly,

amply support the jury's verdict with respect to Count Two."

Paragraph 3 of the summary indictment describes the Warner transaction, charging that it was part of the scheme that Ryan "performed and authorized official actions to benefit the financial interests of . . . Warner . . . . The official actions Ryan performed and authorized included: Awarding, and authorizing the award of, contracts and leases, and intervening in governmental processes related thereto and causing contractual payments to be made to benefit the financial interests of defendant Warner." Paragraph 4 describes the receipt of benefits by Ryan, explaining that "[i]t was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner . . . while defendant Ryan knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts."

In order to convict Ryan on Count Two, the jurors had to believe one of three theories: either (1) Ryan concealed a conflict-of-interest related to the ADM contract; (2) Ryan misused his office for private gain in discussing the contract with Covert; or (3) Ryan accepted benefits (bribes) from Warner in exchange for his intervention. The first theory does not stand on its own. The only conflict of interest presented to the jury relating

to ADM was Ryan's relationship with Warner and Warner's involvement in this contract. Therefore, if the jury found that Ryan concealed a conflict of interest (theory (1)), it necessarily had to find that he had misused his office for private gain (theory (2)), or that he had accepted benefits from Warner in exchange for favors relating to ADM (theory (3)). The misuse of office theory (2) might stand alone if the jury believed that Ryan decided for some illegitimate reason—unrelated to the benefits Warner provided to Ryan—to coerce Covert into withdrawing the specifications. But the only motivations Ryan had to interfere with this contract were for legitimate law-enforcement reasons, as the defense suggested, or to compensate Warner for the stream of benefits he provided, as the Government urged. The jury rejected the good faith motive. Accordingly, the jury could only have convicted him on this count if it believed that his conduct was a response to the stream of benefits. Ryan suggests that the only "private gain" he received for his intervention in this transaction was the approval of his friend. As explained earlier, however, the jurors must have rejected this argument; they were specifically instructed that if the benefits Ryan received from Warner were merely the proceeds of a friendship, they could not be the basis for a conviction. The court concludes that the jury must have found Ryan accepted gifts from Warner with the intent to influence his actions.

The Government did present the awarding of contracts and leases in these terms. In closing, the Government urged:

> George Ryan, as a public official, had a duty to provide honest services to the people of the state of Illinois who had elected him. And the evidence in this case has shown that he repeatedly violated that duty. He violated that duty by giving state benefits, like contracts and leases, to his friends—Warner, Swanson, Klein—while at the same time they were providing various undisclosed financial benefits to him and his family and to his friends. The benefits included free vacations, loans, gifts, campaign contributions, as well as lobbying money that Ryan assigned or directed to his buddies. In short, Ryan sold his office. He might as well have put up a 'for sale' sign on the office.

Further, the Government presented a valid "stream of benefits," "retainer," or "course of conduct" bribery theory when it explained that

> this is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. The type of corruption here—that type of corruption where you give me this, I will give you that, is often referred to as a *quid pro quo*. The corruption here was more like a meal plan

> in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals. And for Warner, Swanson, and Klein it was not a cash bar. This was an open bar during Ryan's terms as secretary of state and as governor.

> While Ryan is correct that the Government also suggested Ryan could be convicted based on a conflict of interest, as explained earlier, that was not a tenable independent theory that would have supported conviction of Ryan on Count Two.

The district court went on to conclude that the other two mail-fraud counts related to Warner (Counts 3 and 8) must be analyzed identically. 759 F. Supp. 2d at 1000. And with this we reach three, more than enough to sustain the RICO conviction and sentence.

The district judge conducted a similar analysis for each of the remaining mail-fraud counts, *id*. at 1000–04, and the application of the mail-fraud theories to finding predicate offenses under RICO, *id.* at 1004. Repetition in this opinion is unnecessary. We don't consider these other four counts, but readers should not infer that we disagree with any part of the district court's analysis. We just think it unnecessary, given that the sentences for all seven mail-fraud convictions have expired.

Our opinion last year held, 645 F.3d at 918–19, that the evidence is sufficient to support a finding of mail fraud, on all counts, under *Skilling*. The Supreme Court did not instruct us to reconsider that portion of our decision.

The district court's order denying Ryan's motion for relief under §2255 therefore is

AFFIRMED.