In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1114

JESUS RUIZ,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-2521 — **Charles R. Norgle**, *Judge*.

ARGUED DECEMBER 4, 2020 — DECIDED MARCH 10, 2021

Before KANNE, WOOD, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In 1997 a federal jury convicted Jesus Ruiz of several crimes for his participation in a deadly kidnapping scheme designed to collect drug debts. Ruiz received seven concurrent life sentences plus an additional consecutive term of 45 years' imprisonment for using a firearm during the underlying crimes of violence in violation of 18 U.S.C. § 924(c).

Now some 20 years later, Ruiz challenges the validity of his § 924(c) convictions. He contends that the predicate offenses underlying these convictions are not "crimes of violence" under the categorical approach required by *United States v. Davis*, 139 S. Ct. 2319 (2019). Rather than reaching the merits of this claim, however, the district court dismissed Ruiz's petition on harmless error grounds, concluding that any error in the § 924(c) convictions would have no effect on Ruiz's seven life sentences. Because we agree that Ruiz is not entitled to relief under 28 U.S.C. § 2255, we affirm.

## I

### A

Jesus Ruiz worked as an "enforcer" collecting drug debts for a Mexican cartel. Ruiz and his co-conspirators—Luis Alberto Carreno, Jose de la Paz Sanchez, Miguel Torres, and Salome Varela—collected payments by kidnapping at gunpoint debtors or their family members, holding them hostage, and beating the victims until ransom payments were made.

In June 1996 the group committed a spree of four kidnappings. Three victims escaped. But a fourth hostage was not so fortunate. Jaime Estrada—a 17-year-old boy and brother of a debtor—was kidnapped by Ruiz and his confederates in Milwaukee. After the kidnappers drove Estrada to Chicago and held him captive in an apartment, they called his brothers demanding a $30,000 ransom payment. While waiting for the payment, Torres shot Estrada in the stomach and locked him in a bathroom, leaving him bleeding and vomiting.

In the meantime, instead of making the ransom payment, Estrada's family contacted law enforcement. The FBI intervened and orchestrated a controlled ransom delivery

operation. As the FBI moved in on Ruiz, Varela, and Torres, the kidnappers fled the scene and led the FBI on a high-speed chase reaching speeds of nearly 100 miles per hour. At one point during the chase, Varela pointed a gun at a federal agent. The chase ended after an agent struck the conspirators' car, and Ruiz, Varela, and Torres were apprehended.

The next morning, an attendant at a used-car lot on Chicago's west side discovered Estrada alive but gravely wounded. Seventeen days later, he succumbed to his injury. A coroner determined that Estrada had died from his gunshot wound and the 30-hour delay in receiving treatment.

B

A federal grand jury returned an indictment against Ruiz, Sanchez, Torres, and Varela. In a superseding indictment, Ruiz faced charges of conspiracy to commit racketeering (18 U.S.C. § 1962(d)), conspiracy to commit kidnapping (18 U.S.C. § 1201(c)), kidnapping resulting in death (18 U.S.C. § 1201(a)), assaulting a federal officer (18 U.S.C. § 111), four counts of violating the Hostage Act, including one count resulting in death (18 U.S.C. § 1203(a)), and three counts of using a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)). The indictment listed a different predicate offense for each of the three § 924(c) counts—specifically, the underlying conspiracy to commit kidnapping, kidnapping, and assault on a federal officer charges.

A jury convicted Ruiz on all counts. The district court then imposed seven concurrent life sentences, a 10-year concurrent sentence, and—for the three § 924(c) convictions—an additional 45-year consecutive sentence. The district court determined that two counts of conviction carried a mandatory life

or death sentence. See 18 U.S.C. § 1201(a) (kidnapping, with the district court finding that death resulted); 18 U.S.C. § 1203(a) (hostage taking, with the district court finding that death resulted). Ruiz's sentencing occurred before the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013), so the findings that resulted in the imposition of mandatory life sentences were made by the trial judge and not the jury. No aspect of this appeal, however, presents a question under *Apprendi* or *Alleyne*.

We affirmed Ruiz's convictions and sentences on appeal. See *United States v. Torres*, 191 F.3d 799 (7th Cir. 1999). Ruiz was just 18 years old when he committed these crimes.

C

For the last 20 years, Ruiz has made several attempts to challenge his sentence through 28 U.S.C. § 2255 and § 2241. So far, none has succeeded.

As for the appeal before us here, the procedural background began six years ago when the Supreme Court decided *Johnson v. United States*, 576 U.S. 591 (2015). In *Johnson*, the Supreme Court invalidated as unconstitutionally vague the so-called residual clause of the Armed Career Criminal Act, which provided one of the Act's alternative definitions for a predicate "violent felony." See 576 U.S. at 606. Ruiz, in turn, sought permission under 28 U.S.C. § 2244(b)(3) to file a new collateral attack, contending that the residual clause of § 924(c)'s definition of "crime of violence" was not only unconstitutionally vague in light of *Johnson*, but also that his predicate offenses otherwise did not count as crimes of violence under § 924(c)'s elements clause. We granted Ruiz's

request. See *Ruiz v. United States*, No. 16-1193 (7th Cir. Feb. 19, 2016).

Ruiz then filed a new § 2255 petition and argued to the district court that his § 924(c) convictions should be vacated because those convictions were based on the residual clause's unconstitutionally vague definition of "crime of violence," and, in any event, that the predicate offenses used to support these convictions did not categorically require "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The government maintained that all three of Ruiz's underlying "crimes of violence" remained valid even after *Johnson* because they involved as an element the "use, attempted use, or threatened use" of force. Alternatively, the government characterized any error as harmless because the validity of the § 924(c) convictions would not affect Ruiz's multiple life sentences.

The district court denied Ruiz's § 2255 motion but, in doing so, declined to reach the merits of his claims. The court instead concluded that any error relating to the § 924(c) convictions was harmless because Ruiz faced seven life sentences, including two mandatory life sentences. Even if Ruiz could show that the reasoning in *Johnson* required his § 924(c) convictions to be vacated, the district court explained, it would not change the reality that he remains subject to seven unchallenged, valid life sentences.

Ruiz appealed, and we granted his certificate of appealability. While his appeal was pending, the Supreme Court decided *United States v. Davis*, holding that the residual clause's definition of "crime of violence" in § 924(c)(3)(B) is indeed

void for vagueness under similar reasoning employed in *John-son*. See 139 S. Ct. 2319, 2336 (2019).

## II

When reviewing the district court's denial of a § 2255 petition, we review its legal conclusions *de novo*. See *Hrobowski v. United States*, 904 F.3d 566, 569 (7th Cir. 2018). Under 28 U.S.C. § 2255(b), if a court "finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law," then "the court shall vacate and set the judgment aside," and shall discharge the prisoner, resentence him, grant a new trial, or correct the sentence "as may appear appropriate."

Mindful of this standard, the parties present their arguments from opposite ends of the spectrum. On one end, Ruiz invites us to proceed directly to the merits of his *Davis* claim and vacate his § 924(c) convictions. On the other end, the government asks us to affirm the district court's harmless error analysis and denial of relief. In the government's view, because Ruiz advances no challenge to his seven life sentences, any relief on the § 924(c) convictions would not affect the amount of time he spends in prison—the definition of harmless error, as the government sees it.

The question of which route to take—Ruiz's or the government's—is not answered by our case law. Nor has our court had occasion to decide whether two of the potential predicate offenses underlying Ruiz's § 924(c) convictions—kidnapping resulting in death (18 U.S.C. § 1201(a)) and assault on a federal law enforcement officer (18 U.S.C. § 111)—are crimes of violence under § 924(c)(3)'s elements clause. In the end, we

agree with the district court's approach, so we decline to address the more complicated merits questions.

A

The doctrine of harmless error is the product of judicial reform dating to the early twentieth century. See *Chapman v. California*, 386 U.S. 18, 48 (1967) (Harlan, J., dissenting) (describing the evolution of the American harmless error rule). Most American appellate courts previously followed the English rule, which "held that *any* error of substance required a reversal of conviction." *Id.* (emphasis added). This approach—which applied to constitutional errors and statutory- and common-law violations alike—had the unfortunate effect of devolving the criminal trial into a "game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had been thus obtained." *Kotteakos v. United States*, 328 U.S. 750, 759 (1946); see also *Chapman*, 386 U.S. at 48–49 (Harlan, J., dissenting).

Concerned that appellate courts were operating as "impregnable citadels of technicality," *Kotteakos*, 328 U.S. at 759 (footnote omitted), Congress responded in 1919 by enacting Section 269 of the revised Judicial Code. See Sam Kamin, *Harmless Error and the Rights/Remedies Split*, 88 Va. L. Rev. 1, 10 (2002). The updated code required appellate courts "to reverse lower court rulings *only* where the substantial rights of the parties were adversely affected at trial." *Id.* (emphasis added). At the time, though, the reformed harmless error rule applied to only statutory and procedural errors. See *id.* Errors of constitutional magnitude still warranted reversal of a defendant's conviction. See *id.*

More change came in 1967. It was then that the Supreme Court decided *Chapman v. California*, which upended the dichotomy between constitutional and non-constitutional errors by holding that the doctrine of harmless error applies to "constitutional errors which in the setting of a particular case are so unimportant and insignificant" that they may be deemed inconsequential. 386 U.S. at 22.

But some constitutional errors, the *Chapman* Court recognized, remain so intrinsically damaging and basic to our trial system as to never be harmless. See *id.* at 23 n.8 (listing as examples *Payne v. Arkansas*, 356 U.S. 560 (1958) (coerced confession); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (right to counsel); and *Tumey v. Ohio*, 273 U.S. 510 (1927) (impartial judge)). The law has come to call these violations structural errors. See *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) ("The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial."); see, *e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (failure to give a jury a reasonable-doubt instruction); *Batson v. Kentucky*, 476 U.S. 79 (1986) (exclusion of jurors based on race); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (exclusion of grand jurors based on race); *Waller v. Georgia*, 467 U.S. 39 (1984) (denial of a public trial); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (denial of the right to self-representation at trial).

At bottom, the doctrine of harmless error owes its existence to the concept that a legal error having no consequential effect on a judgment does not necessarily need to be rectified. See 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects

which do not affect the substantial rights of the parties."). Our cases make clear that the doctrine likewise applies to ordinary sentencing errors. See, *e.g.*, *United States v. Clark*, 906 F.3d 667, 671 (7th Cir. 2018) ("In a criminal-sentencing case, a finding of harmless error 'removes the pointless step of returning to the district court when we are convinced that the sentence the judge imposes will be identical to the one we remanded.'" (quoting *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009))). At its core, harmless error review is an equitable doctrine allowing courts to decline to afford relief when an error does not affect an existing judgment. See *Chapman*, 386 U.S. at 22–24.

Two Supreme Court cases define and govern our modern harmless error doctrine. The first case, *Chapman*, remains the leading decision for reviewing constitutional errors on direct appeal and places the burden on the government to show that the error "was harmless beyond a reasonable doubt." *Id.* at 24. The second case, *Brecht v. Abrahamson*, applies to constitutional infirmities identified and advanced by state prisoners on collateral review in federal habeas corpus proceedings. See 507 U.S. 619 (1993). Under *Brecht*, the state prisoner bears the burden of demonstrating that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637–38.

To date the Supreme Court has not addressed whether *Chapman*, *Brecht*, or a third standard applies to federal prisoners seeking post-conviction relief under 28 U.S.C. § 2255. Neither has our court taken a position on the issue and indeed "our caselaw gestures in conflicting directions." *Daniels v. United States*, 939 F.3d 898, 903 (7th Cir. 2019). In *Lanier v. United States*, for example, we applied a *Chapman*-like

harmless error standard to the petitioner's § 2255 motion. See 220 F.3d 833, 839 (7th Cir. 2000). More recently in *Sorich v. United States*, however, we applied the *Brecht* standard to a § 2255 motion on the joint agreement of the parties. See 709 F.3d 670, 674 (7th Cir. 2013).

All of these principles apply here. And against this legal framing of the harmless error doctrine, we turn to what all of this means for Ruiz's § 924(c) convictions and his 45-year consecutive sentence.

## B

In the midst of the uncertainty surrounding harmless error review in the context of § 2255 petitions, we need not plant our feet firmly on the correct standard to apply in Ruiz's case. Under either measure—and with the extraordinary fact pattern before us—we cannot say that any error underlying Ruiz's § 924(c) convictions could be considered anything other than harmless. See *Daniels*, 939 F.3d at 903 (declining to "resolve [the] tension" in our case law because the error was "harmless under any standard").

Recall that in addition to the 45-year consecutive sentence, Ruiz received seven concurrent life terms. For two of his convictions—the hostage taking of Jaime Estrada (18 U.S.C. § 1203(a)) and the related kidnapping (18 U.S.C. § 1201(a))— the district court determined, based on the jury's verdict and factual findings at sentencing, that death resulted and that it was required to impose a punishment of life imprisonment or death. Ruiz does not challenge the validity of those convictions or, for that matter, any of his seven life sentences.

With the reality of Ruiz's stark situation before us, it is difficult to see how any relief—even a complete vacatur of the

§ 924(c) convictions and their accompanying sentences—
would reduce the time that Ruiz must serve in prison. Stated
otherwise, he cannot show any prejudice befalling him from
any erroneous § 924(c) convictions. Nor has Ruiz established
that he will suffer any concrete, non-speculative collateral
consequences if we decline to reach the merits of his *Davis*
claim, let alone any consequences affecting his "custody" for
purposes of habeas relief. See 28 U.S.C. § 2255.

Ruiz begs to differ and presses us to presume that his
§ 924(c) convictions and his 45-year consecutive sentence
carry collateral consequences. Relying on *Sibron v. New York*,
392 U.S 40 (1968), Ruiz emphasizes that "the obvious fact of
life [is] that most criminal convictions do in fact entail adverse
collateral legal consequences." *Id.* at 55. At that level of gener-
ality, Ruiz is right. Indeed, the Supreme Court has been "will-
ing to presume that a wrongful criminal conviction has con-
tinuing collateral consequences (or, what is effectively the
same, to count collateral consequences that are remote and
unlikely to occur)." See *Spencer v. Kemna*, 523 U.S. 1, 8 (1998)
(citing *Sibron*, 392 U.S. at 55–56). But recognizing that general
presumption does not establish the more specific precept that
a criminal conviction can never be harmless—that circum-
stances may exist where collateral consequences are exceed-
ingly remote and highly unlikely to ever manifest themselves.
Nor, of course, does Ruiz's general observation account for
the reality that his pursuit of habeas relief depends on identi-
fying a collateral consequence that rises to the level of impact-
ing his ongoing "custody," as required by § 2255.

Perhaps the closest Ruiz gets to identifying a realistic col-
lateral consequence is his mentioning the $300 special assess-
ment that the district court ordered him to pay for the § 924(c)

convictions. See 18 U.S.C. § 3013(a)(2)(A). Though this posi-
tion would have merit on direct appeal, it falls short here be-
cause § 2255 serves as a remedy to contest a prisoner's cus-
tody—not the imposition of fines or other special assess-
ments. See *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir.
2012) ("A collateral attack under § 2241, § 2254, or § 2255 con-
tests only custody, however, and not fines or special assess-
ments.").

Ruiz also suggests that if he were convicted of another
§ 924(c) offense someday in the future, his prior firearm con-
victions would trigger increased penalties. But this contention
rests on a big "if": that scenario could come to pass only if
Ruiz somehow managed to possess a gun while incarcerated.

In further effort to establish a collateral consequence, Ruiz
observes that Congress and the Bureau of Prisons generally
differentiate among prisoners based on their offense of con-
viction, and it is within the government's prerogative to enact
measures unique to individuals like Ruiz with § 924(c) con-
victions. See, *e.g.*, 18 U.S.C. § 3632(d)(4)(D)(xxii) (rendering
prisoners ineligible for time credit if convicted of a § 924(c)
offense); 28 C.F.R. § 550.55(b)(5)(ii) (listing convictions that
make inmates ineligible for early release, including firearm
offenses). We remain unpersuaded by these examples, how-
ever, because Ruiz still faces other valid convictions carrying
life sentences that prevent him from taking advantage of time
credit for good behavior. See 18 U.S.C. § 3624(b)(1) (prisoners
with life sentences ineligible for good-time credit). At bottom,
Ruiz points to no traditional collateral consequences—like the
loss of the right to vote, participate on a jury, or own a fire-
arm—that would not also result from his unchallenged con-
victions and life sentences. And though the range of potential

adverse collateral consequences remains broad, Ruiz cannot show that any of them rise to the level of "custody" in the face of seven life sentences he does not even challenge.

On another front, Ruiz urges us to consider how future legislative or judicial developments could eventually undermine his non-§ 924(c) convictions or life sentences, such that it would be preferable to litigate his *Davis* challenge now. But in addition to not identifying any potential and likely collateral consequences, neither has Ruiz forecasted any foreseeable changes in the law that call into question his seven life sentences. All Ruiz has done, and understandably so, is offer views about how the law may someday change to afford him relief for *all seven life sentences*. And even if the law were to change—either through legislative action or by Supreme Court decisions—Ruiz would face yet another hurdle of counting on Congress or the Court to apply the law retroactively.

In the end, Ruiz has not put forth circumstances enabling us to conclude that any error with his § 924(c) convictions is anything other than harmless.

## C

In a similar vein to harmless error review, the government invites us by analogy to consider the reasoning supporting the concurrent sentence doctrine. This discretionary doctrine allows courts to "pretermit decision about convictions producing concurrent sentences, when the extra convictions do not have cumulative effects." *Ryan*, 688 F.3d at 849. Put another way, the doctrine "allows appellate courts to decline to review a conviction carrying a concurrent sentence when one 'concurrent' conviction has been found valid." *Cheeks v. Gaetz*,

571 F.3d 680, 689 (7th Cir. 2009) (quoting *United States v. Kimberlin*, 675 F.2d 866, 867 (7th Cir. 1982)).

The extent to which the doctrine may apply "depends on the degree of prejudice that may be attributed to the challenged conviction." *Id.* at 689 (quoting *Cramer v. Fahner*, 683 F.2d 1376, 1380 (7th Cir. 1982)). Where no prejudice results from foregoing review of the challenged conviction, a court may properly exercise its discretion in declining to reach the merits of the conviction. See *Hill v. Werlinger*, 695 F.3d 644, 649 n.1 (7th Cir. 2012) (explaining that the doctrine requires (1) an equal or longer sentence on an unchallenged or affirmed conviction and (2) no adverse collateral consequences to the prisoner by declining to review the challenged conviction).

A recent application of the concurrent sentence doctrine came in *Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012). In *Ryan*, a federal jury convicted the former Illinois governor of several crimes based on his involvement in a corruption scandal. Among his many crimes of conviction was one RICO violation, which resulted in a sentence of 78 months. See *id.* at 848. Ryan's remaining sentences—60-month sentences on seven mail-fraud convictions, 60-month sentences on three false-statement counts, and 36-month sentences on four tax counts—ran concurrently with each other and with the 78-month RICO sentence. See *id.* On post-conviction review under § 2255, Ryan challenged the validity of his RICO conviction and the seven mail-fraud convictions that served as the underlying predicate acts necessary to sustain his RICO conviction. See 18 U.S.C. § 1962(d). Rather than review the validity of each of the seven mail-fraud convictions, we instead considered *only* whether there were enough valid mail-fraud

convictions to uphold the RICO conviction. See *Ryan*, 688 F.3d at 848. "An attempt to decide on collateral review whether *each* of the seven mail-fraud convictions was valid," we explained, would be "unnecessary" and "would smack of an advisory opinion." *Id.* at 849, 852.

Ruiz's situation, of course, does not fit within the concurrent sentence doctrine because his § 924(c) convictions yielded *consecutive* sentences to be served in addition to his seven life sentences. Even so, the same considerations of futility, speculation, and preservation of judicial resources that underpinned our discretion in *Ryan* to not review all seven mail-fraud convictions rings true here too. Reviewing the validity of Ruiz's § 924(c) convictions in the face of seven remaining and valid life sentences is similarly unnecessary, as our review would lead to no practical or concrete sentencing relief for Ruiz.

Make no mistake. We are not adopting a "consecutive sentence doctrine" analogous to the concurrent sentence doctrine. In ordinary cases, such a doctrine could not operate. Indeed, in most circumstances involving consecutive sentences, a prisoner would suffer tangible prejudice if an invalid conviction remained on his record because he would be required to serve a longer actual prison term. But based on the exceptional circumstances presented here—Ruiz's unchallenged seven life sentences and a 45-year consecutive sentence—the government's analogy to the concurrent sentence doctrine reinforces our harmless error analysis: Ruiz has not demonstrated that he will suffer actual prejudice by our foregoing review of his *Davis* claim.

D

Consider the alternative pressed by Ruiz. His position would require us to confront complex legal questions yet to be addressed by our court.

This complexity is not imaginary. Take, for example, Ruiz's conviction for kidnapping Estrada in violation of 18 U.S.C. § 1201(a). Ruiz and the government dispute whether the jury convicted Ruiz of "simple" kidnapping or kidnapping resulting in death. This dispute is largely driven by conflicting indicators in the so-called *Shepard* documents. See *Shepard v. United States*, 544 U.S. 13, 16 (2005) (explaining that courts, when applying the modified categorical approach, may examine a limited class of documents, such as the indictment, jury instructions, and other trial court records); see also *Haynes v. United States*, 936 F.3d 683, 687 (7th Cir. 2019) (applying *Shepard* in the context of § 924(c) convictions). The indictment seems to have charged Ruiz with kidnapping resulting in death, but the jury instructions suggested that he was convicted of simple kidnapping. The difference matters because simple kidnapping is not a crime of violence, see *United States v. Jenkins*, 849 F.3d 390, 394 (7th Cir. 2017), cert. granted, judgment vacated, 138 S. Ct. 1980 (2018), reinstated sub. nom., *United States v. Jackson*, 932 F.3d 556, 557 (7th Cir. 2019), but kidnapping resulting in death might be.

Taking the next step in the analysis, if we were to agree with the government that Ruiz was convicted of kidnapping resulting in death, we would then have to decide whether that offense qualifies as a "crime of violence" under the elements clause in 18 U.S.C. § 924(c)(3). At least two circuits have answered that question yes, but both did so over dissenting opinions. See *In re Hall*, 979 F.3d 339 (5th Cir. 2020); *United*

*States v. Ross*, 969 F.3d 829 (8th Cir. 2020). Though kidnapping resulting in death "sure sounds like a 'crime of violence,'" making that determination is by no means simple. *Ross*, 969 F.3d at 845 (Stras, J., concurring in the judgment in part and dissenting in part). Indeed, because we have already held that simple kidnapping is not a crime of violence, our inquiry would focus on whether the statutory language, "if the death of any person results," *necessarily* involves the use of force as understood in § 924(c)(3)(A). And if we were apt to disagree with the Fifth and Eighth Circuits, we would create a circuit split.

To be sure, we have benefitted from outstanding representation provided by all counsel on appeal, and if we were to address the merits questions, we would be aided by their thorough briefing and effective advocacy. Yet, given the unique circumstances before us, this appeal does not require us to answer these difficult questions.

## III

As for the views of our dissenting colleague, we agree with nearly all of them. Our disagreement is limited in that we stop short of recognizing a nearly *per se* rule that an unlawful conviction always constitutes a prejudicial error as a matter of law—regardless of the sentence.

We do not see such an ironclad requirement as consistent with habeas relief concentrating on the ongoing lawfulness of a petitioner's custody. Nor, in our respectful view, could such an unyielding rule be reconciled with the concurrent sentence doctrine. It matters not that the concurrent sentence doctrine arose as a discretionary principle, for adoption of a categorical legal rule that a wrongful conviction is always remediable

and never harmless would prohibit the exercise of discretion in all cases.

Our decision is also narrow. In almost all situations, the combination of a constitutionally infirm conviction and consecutive sentences will be prejudicial to a defendant. Overwhelmingly, unlawful convictions carry with them consequences, such that harmless error will have no place in a proper analysis.

This case, however, presents the exceedingly rare occasion in which the opposite is true. Absent some extraordinary and unexpected change in the law with retroactive application, Ruiz's seven life sentences will remain in place. Vacating Ruiz's § 924(c) convictions (assuming his *Davis* claim has merit) does nothing to change that unfortunate reality for Ruiz. On top of that, Ruiz would face the nearly insurmountable challenge of persuading a court to reduce not just one or two, but all *seven* of his life sentences to secure any prospect of tangible relief.

For these reasons, we AFFIRM.

WOOD, *Circuit Judge*, dissenting. In this proceeding under 28 U.S.C. § 2255, Jesus Ruiz has argued compellingly that he stands convicted of multiple nonexistent crimes, for which he has been sentenced to a term of 45 years. That sentence is to run consecutively to his life sentences on other counts. The government concedes that one conviction underlying the 45-year sentence was erroneous. Ordinarily this would cry out for relief. But because of the life sentences, the majority sees no point in recognizing or correcting this error. It believes, to put it formally, that Ruiz has not, and never can, suffer any prejudice from the extra 45 years, and so no action is required.

Both for formal reasons and for practical reasons, I would hold that a conviction for a noncrime is always prejudicial error as a matter of law, regardless of the sentence and how it relates to other convictions and sentences from the same or other proceedings. Furthermore, my crystal ball is not as clear as the majority's. Future legal developments whose likelihood, while perhaps not high, is real, may at a stroke sweep away all seven life sentences and make that 45-year sentence of immediate concern. Its existence on Ruiz's record cannot be brushed away as harmless error. And now is the time to take action. If Ruiz were to try to bring a second motion under section 2255 in the wake of a pertinent change, there is no guarantee he could meet the exacting criteria of 28 U.S.C. § 2255(h) to pursue it. I would reverse the district court's denial of relief and reach the merits of Ruiz's claims under *United States v. Davis*, 139 S. Ct. 2319 (2019). I therefore respectfully dissent.

**I**

A

A federal defendant has a due process right to be tried and convicted only for a crime that actually exists. "[C]onviction and punishment … for an act that the law does not make criminal … 'inherently results in a complete miscarriage of justice' … ." *Davis v. United States*, 417 U.S. 333, 346 (1974). A conviction for a "nonexistent offense" thus reflects a "fundamental … defect" in a criminal judgment and must be set aside. *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998).

As the majority notes, Ruiz was indicted on numerous counts associated with his kidnapping of four victims, one of whom died. Pertinent here, the indictment also charged him with three counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). He was convicted on all counts, and he received seven concurrent life sentences for the racketeering, kidnapping, and hostage offenses; he *also* received an additional *consecutive* sentence of 45 years for the three firearms offenses. Two of the life sentences were mandatory under the governing statutes, 18 U.S.C. §§ 1201(a) and 1203(a). At the time of the offenses, Ruiz was 18 years old.

In this appeal, Ruiz is not directly challenging any of the life sentences. He argues only that his three section 924(c) convictions are based on conduct that is no longer criminal after the Supreme Court's 2019 *Davis* decision, 139 S. Ct. 2319, and so the sentences associated with them must be set aside. Each of those three convictions matters: the 45-year term represented a five-year consecutive sentence on Count 9, a 20-year consecutive sentence on Count 10, and another 20-year

consecutive sentence on Count 11. So setting aside even one of the counts of conviction would have a concrete impact. The government concedes that at least one of Ruiz's firearms convictions can no longer stand: Count 9, which was based on the predicate offense of "conspiracy to kidnap." That conviction is no longer valid because conspiracy to kidnap is not a crime of violence under section 924(c)(3)(A). See *D'Antoni v. United States*, 916 F.3d 658, 665 (7th Cir. 2019).

Despite the government's concession, as well as the strength of Ruiz's arguments that his other section 924(c) convictions are also invalid after *Davis*, the majority declines to reach the merits because it sees no prejudice to Ruiz stemming from this "fundamental" error. Any error was harmless, the majority reasons, because even if we were to invalidate one or more of Ruiz's section 924(c) convictions, it believes that there is nothing that would change the fact that he is subject to seven concurrent life sentences. As a result, it believes, our decision would have no practical effect.

I have no quarrel with the proposition that harmless-error analysis is required for a section 2255 motion. See Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 12 (applicability of the Federal Rules of Civil Procedure). My dispute is with the application of that rule.

The harmless-error inquiry involves two variables: a defect and an outcome. Courts engaged in harmless-error analysis generally ask the following counterfactual question: whether, absent the identified defect in a judicial proceeding, the outcome of the proceeding would be different. If so, then

the defendant was harmed by the error and relief is appropriate. (Although certain structural defects are deemed always to be harmful, for present purposes I do not take issue with the majority's implicit conclusion, *ante* at 8, that no such alleged error occurred here.)

In Ruiz's case, the relevant defect appears in the court's jury instruction, which made it possible for Ruiz to be convicted based on facts that the law does not criminalize. The relevant outcome is Ruiz's conviction. See *California v. Roy*, 519 U.S. 2, 5 (1996) (holding that where there is "an error in the instruction that defined the crime," the proper inquiry is "whether the error had substantial and injurious effect or influence in determining the jury's *verdict*" (emphasis added) (internal quotation marks omitted)). When viewed from this perspective, we are safe in concluding that but for the error in the judicial proceedings (*i.e.*, the defective instruction), the outcome would have been different (*i.e.*, Ruiz would not have been convicted on one or more of the section 924(c) counts). Under the harmless-error test, a conviction for a noncrime is, by definition, harmful.

The majority goes off track by analyzing the wrong variables: Instead of asking whether Ruiz's conviction would stand had his jury been instructed to find the elements of a valid crime, the majority jumps to the question whether the practical length of Ruiz's overall sentence would be any different if his firearms convictions were invalidated. Put another way, the majority views Ruiz's conviction as the error, not the harm.

This approach finds no support in the harmless-error jurisprudence. The principal cases upon which the majority relies actually reinforce the notion that the appropriate object

when assessing harm is the conviction, not the resulting sentence. See *Chapman v. California*, 386 U.S. 18, 26 (1967) (finding no harmless error where a defect in the trial proceedings "did not contribute to petitioners' *convictions*" (emphasis added)); *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (assessing whether the "error had substantial and injurious effect or influence in determining the jury's *verdict*" (emphasis added) (internal quotation marks and citations omitted)). Even the historical backdrop that the majority cites suggests why harmless error is inapposite here: when the harm in question is a conviction for conduct that the law criminalized at the time of conviction but that has since been recognized as not falling under any criminal prohibition, a court's vacation of that conviction does not create an incentive for litigants to engage in a "game for sowing reversible error in the record." *Kotteakos v. United States*, 328 U.S. 750, 759 (1946). No defendant has that much foresight.

B

Although the harmless-error test looks only to whether a defect in judicial proceedings makes the difference between conviction or acquittal, in one limited context courts do ask whether an invalid conviction will have an effect on the length of a defendant's sentence. That has come to be called the concurrent-sentence doctrine. See, *e.g.*, *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012).

The concurrent-sentence doctrine has some similarities to harmless-error analysis, but the two rules differ in both source and scope. First, the concurrent-sentence doctrine is a discretionary, judicially created, tool, see *Steffes v. Pollard*, 663 F.3d 276, 280 (2011), whereas the harmless-error test is mandatory,

see Fed. R. Civ. P. 61; *In re Rafdo Enters., Inc.*, 297 F.2d 505, 507 (7th Cir. 1962). This means that the concurrent-sentence doctrine is not just a particular application of harmless error. Were that the case, the concurrent-sentence doctrine would be mandatory, not discretionary.

Even if the two ideas were thought to overlap, the insurmountable problem for the majority is that (as it concedes) the concurrent-sentence doctrine does not apply here. Ruiz's sentences are *consecutive*, not concurrent: the district court sentenced him to life *plus* 45 years. His section 924(c) sentences have not begun to run and will not start unless and until his life sentences are shortened or removed. There is no "consecutive-to-a-life-sentence doctrine." To extend the concurrent-sentence doctrine to this setting would be to call into question the purpose of sentencing defendants to consecutive sentences beyond life terms—a common and longstanding judicial practice.

The majority thus errs, in my estimation, by looking to the concurrent-sentence doctrine to justify its replacement of the appropriate object of harmless-error inquiry (the conviction) with an inappropriate one (the overall length of the sentence). The fact that the overall length of a sentence is relevant to the concurrent-sentence doctrine does not mean that it is relevant to harmless-error analysis. Contrary to the position the majority takes today, it is always the case that where there is a challenge to a conviction for a noncrime, the defendant's "substantial rights" have been affected, and so there is harmful error.

## II

Even accepting the faulty premise that harmless-error analysis permits us to look past the inherent prejudice Ruiz suffers from a defective conviction, the majority's analysis still falls flat.

The majority concludes that Ruiz's defective firearms convictions are harmless because he is unable to show that he suffers any collateral consequences from those convictions that he does not otherwise suffer from his life sentences.

A glaring problem with the majority's reasoning is that it ignores the clear command of *Sibron v. New York*, 392 U.S. 40 (1968). *Sibron* rejects "all inquiry into the actual existence of specific collateral consequences" and establishes a *presumption* that there are collateral consequences associated with each conviction in a criminal judgment. *Id.* at 55. Critically, the Supreme Court observed that it saw "no relevance in the fact that Sibron [was] a multiple offender" because it is "impossible … to say at what point the number of convictions on a man's record renders his reputation irredeemable." *Id.* at 56.

Of particular relevance here, the *Sibron* Court also noted the possibility that future legal reforms might invalidate Sibron's remaining convictions, leaving only the challenged conviction to stand. The Court explained:

We cannot foretell what opportunities might present themselves in the future for the removal of other convictions from an individual's record. The question of the validity of a criminal conviction can arise in many contexts and the sooner the issue is fully litigated the better for all concerned. … And it is far better to eliminate the source of a potential legal disability than to

require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose it on the basis of some past action.

*Id.* at 56–57 (citation omitted).

Although *Sibron* dealt with mootness, not harmless error, its reasoning applies with equal force here. For all intents and purposes, *Sibron* creates a categorical rule that criminal convictions carry collateral consequences—full stop. The majority's willingness to overlook a sentence of 45 years is inconsistent with *Sibron*. The majority also ignores *Sibron*'s language about the possibility of future legal reforms. *Sibron* effectively tells courts not to assume the impossibility of legal reforms that might invalidate a defendant's other convictions or modify his sentence. Under *Sibron*, the mere chance (no matter how remote) that future reforms *might* invalidate or decrease the length of Ruiz's life sentences means that Ruiz's section 924(c) convictions have practical consequences distinct from those of his life sentences.

With one eye on history and the other on current developments, it is not hard to imagine future legal reforms that would alter Ruiz's remaining convictions or sentences. And these possibilities are far from remote. At the time Ruiz committed the conduct for which he was convicted and sentenced to mandatory life without parole, he was only a few months past his 18th birthday. In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment. The Court justified this rule on the theory that offenders under the age of 18

have "diminished culpability" because of their "lack of maturity," "underdeveloped sense of responsibility," and character that is less "well formed," as compared with that of adults. *Id.* at 471. *Miller* upended many convictions for which the defendants had received life sentences. For those who had also been sentenced to consecutive terms of years, the latter sentences sprang into relevance with their post-*Miller* proceedings.

*Miller* is part of a long line of cases recognizing that the Constitution demands different penal treatment for young offenders—a group that up until now has been defined as those under the age of 18. See, *e.g.*, *Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551 (2005). As the *Miller* Court noted, these decisions are grounded in science. Courts have paid heed to "developments in psychology and brain science [that] show fundamental differences between juvenile and adult minds" including the "parts of the brain involved in behavior control." *Miller*, 567 U.S. at 471–72 (quoting *Graham*, 560 U.S. at 68). For now, they are using the age of 18 as the relevant cut-off point, largely because of the scientific community's assessments regarding the length of the developmental period in the human brain.

But science does not stand still, and there is no reason to think that it will do so going forward. The scientific community's views on the development of the brain evolve all the time. One of the medical authorities on which the Supreme Court has relied most heavily on questions of neurological development is the American Association on Intellectual and Developmental Disabilities (AAIDD). Since *Atkins v. Virginia*, 536 U.S. 304 (2002), nearly every Supreme Court case concerning intellectual and developmental disabilities has drawn

significantly from the medical conclusions set forth in the AAIDD's treatise, INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (11th ed. 2010). See *Moore v. Texas* 137 S. Ct. 1039, 1048–53 (2017); *Brumfield v. Cain*, 576 U.S. 305, 308, 315, 319, 320 (2015) (citing the 10th edition); *Hall v. Florida*, 572 U.S. 701, 713 (2014); *Atkins v. Virginia*, 536 U.S. 304, 308 n.3, 317 n.22 (2002) (citing the 9th edition). Just this year, the AAIDD released the 12th edition of its treatise. See INTELLECTUAL DISABILITY: DEFINITION, DIAGNOSIS, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (12th ed. 2021). In it, the Association defines the end of the human intellectual developmental period as "the age of 22"—not 18. See *id.* at 1, 13, & 32. See also *Frequently Asked Questions on Intellectual Disability*, AAIDD https://www.aaidd.org/intellectual-disability/definition/faqs-on-intellectual-disability. Interestingly enough, this harmonizes the judgment of the scientific community with federal law, which since 2000 has recognized 22 as the age at which neurological development ends. See 42 U.S.C. § 15002(8) (definitions for programs for individuals with developmental disabilities).

Given the heavy emphasis the Supreme Court has placed on scientific evidence in this corner of its jurisprudence, the scientific community's evolving views on the neurological developmental period may prove to have wide ranging effects on the law. It is not at all fanciful to think that, at some point in the not-too-distant future, the Court might revise the *Miller* line of cases and push the relevant age at which the Eighth Amendment prohibits mandatory life sentences without parole to 22. Critically, the rule set forth in *Miller* is retroactive on collateral review. See *Montgomery v. Louisiana*, 136 S. Ct. 718, 732 (2016). Thus, if the Court, at any point during Ruiz's imprisonment, were to revise the rule in *Miller* and raise the

Eighth Amendment age-line to 22, Ruiz's life sentences would become eligible for immediate resentencing. At this point, his consecutive 45-year sentence stemming from his section 924(c) convictions would take on immense practical significance. See *United States v. Cephus*, 684 F.3d 703, 710 (7th Cir. 2012).

It is impossible to assess how likely such a change is, but the probability is certainly well above zero. (Many people would not have predicted the original *Miller* decision until it was issued.) That is all that matters for Ruiz's case. Another possible change would be statutory: many people did not predict the Fair Sentencing Act, 124 Stat. 2372, and the later First Step Act, 132 Stat. 5194, which taken together retroactively lowered many drug sentences. Such a legislative change could also affect Ruiz's life sentences (and would be particularly difficult to present in a successive section 2255 motion). Beyond all this, we should remember the Court's admonition in *Sibron*: courts are ill-equipped to "foretell what opportunities might present themselves in the future for the removal of other convictions from an individual's record" and so should err on the side of "eliminat[ing] the source of a potential legal disability" when the issue is squarely presented. *Sibron*, 392 U.S. at 56–57. That is precisely the case here.

### III

Finally, the majority suggests that we should not address Ruiz's claims on the merits because they involve complicated issues of first impression. But Article III courts have a duty to decide cases before them, no matter how novel or complicated the issues may be. See *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("The judiciary cannot, as the legislature may,

avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us."). In this case, neither harmless error nor the concurrent-sentence doctrine permits us to avoid our "unflagging obligation" to decide the case before us. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

This case is not a good candidate for avoidance in any event: the majority greatly exaggerates the difficulty of resolving Ruiz's merits claims. The government already has conceded that conspiracy to commit kidnapping is not a crime of violence, and so Ruiz's Count 9 conviction is gone. Next, as the majority acknowledges, for Count 10 the jury expressly found only the predicate elements of simple kidnapping beyond a reasonable doubt in its verdict, and we already have held that simple kidnapping is not a crime of violence. *United States v. Jenkins*, 849 F.3d 390, 395 (7th Cir. 2017), *vacated*, 138 S. Ct. 1980 (2018), *reinstated sub nom. United States v. Jackson*, 932 F.3d 556, 558 (7th Cir. 2019). That might well take care of Count 10. What's left is Ruiz's Count 11 conviction. To resolve that, we would need to apply the well-known modified categorical approach to the elements of the predicate offense, see *Shepard v. United States*, 544 U.S. 13 (2005), a task we regularly undertake. These circumstances hardly merit avoidance.

In my view, Ruiz's life sentences do not excuse us from the duty to examine his firearms convictions under *Davis*, nor do those life sentences render any error in the firearms counts harmless, and so I respectfully dissent.