# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued December 14, 2023       Decided June 14, 2024

No. 22-3033

UNITED STATES OF AMERICA,
APPELLEE

v.

GERALD SMITH,
APPELLANT

————

Consolidated with 22-3080

————

Appeals from the United States District Court
for the District of Columbia
(No. 1:95-cr-00154-8)

————

*Gregory Stuart Smith*, appointed by the court, argued the cause and filed the briefs for appellant.

*Michael E. McGovern*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

2

Before: MILLETT and PAN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Three decades ago, Gerald Smith was convicted of murder, kidnapping, and drug trafficking charges. Under the then-mandatory sentencing guidelines, he was sentenced to multiple life sentences on his federal-law convictions, life without parole on several murder convictions under District of Columbia law, and a further term of 65 years for various "crimes of violence," 18 U.S.C. § 924(c)(3), set to run consecutively to his life sentences.

In 2018, Congress passed the First Step Act, which allows courts to resentence defendants convicted for certain drug crimes that carry lighter sentences today than at the time of sentencing. Then, in 2019, the Supreme Court held unconstitutionally vague one aspect of the "crime-of-violence" definition set forth in 18 U.S.C. § 924(c)(3). *See United States v. Davis*, 588 U.S. 445, 470 (2019). Smith asks for vacatur of his crime-of-violence convictions and for First Step Act resentencing for other convictions. The district court denied both forms of relief. We affirm in all relevant respects.[1]

**I**

**A**

Federal law imposes enhanced punishment for the use of a firearm in connection with a federal "crime of violence or

---

[1] As the parties have agreed, we enter a limited remand for the district court to correct Smith's order of judgment and conviction to comport with our earlier decision in his case.

drug trafficking crime[.]" 18 U.S.C. § 924(c)(1)(A). Specifically, in addition to any sentence imposed for an underlying crime, Section 924(c) imposes an *additional* sentence, with minimums from 5 to 30 years if the underlying crime is a "crime of violence" or a drug-trafficking crime and involved a specified use of certain firearms. *Id.* § 924(c)(1)(A)–(C). Sentences under Section 924(c) may not run concurrently with any other sentence, including that of the underlying crime of violence or drug trafficking crime. *Id.* § 924(c)(1)(D)(ii). That means that a conviction under Section 924(c) requires "long prison sentences" on top of whatever other sentence a defendant already faces. *Davis*, 588 U.S. at 448.

This case implicates Section 924(c)'s application to a "crime of violence," which is defined as:

an offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3)(A)–(B). Clause (A) is commonly referred to as the "elements clause," while Clause B is known as the "residual clause."

The Supreme Court invalidated Section 924(c)'s residual clause as unconstitutionally vague in *United States v. Davis*, 588 U.S. 445 (2019). As a result, Section 924(c)'s enhanced

penalty now applies only if the relevant offense satisfies the elements clause's requirement that the crime include as an element the actual, attempted, or threatened use of physical force.

To determine whether a particular conviction satisfies the elements clause, courts "apply a 'categorical approach'" because the text of the elements clause focuses on the legal "elements" of the underlying crime, not an individual's conduct in committing it. *United States v. Taylor*, 596 U.S. 845, 850 (2022); *id*. (The elements clause "precludes * * * an inquiry into how any particular defendant may commit the crime."). Consequently, in applying the elements clause, courts must determine "whether the federal felony at issue 'has *as an element* the use, attempted use, or threatened use of physical force.'" *Id.* (quoting 18 U.S.C. § 924(c)(3)(A)).

Several other provisions of federal law employ similarly or even identically worded elements clauses. *See, e.g.*, 18 U.S.C. § 924(e)(2)(B)(i) (defining a "violent felony" under the Armed Career Criminal Act ("ACCA") as a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another"); *id.* § 921(a)(33)(A)(ii) (defining "the term 'misdemeanor crime of domestic violence'" to include an offense that, among other things, "has, as an element, the use or attempted use of physical force"); *see also* UNITED STATES SENT'G GUIDELINES MANUAL § 4B1.2(a)(1) (defining "crime of violence" to mean any crime punishable by more than one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another"). Cases interpreting these other provisions provide helpful guideposts in our application of Section 924(c)(3)(A). *See, e.g.*, *United States v. Carr*, 946 F.3d 598, 604 (D.C. Cir. 2020).

**B**

Concerned with sentencing disparities between powder and crack cocaine offenses, Congress passed the 2010 Fair Sentencing Act, which "raised the crack-cocaine threshold quantities for triggering certain penalty ranges" for various drug convictions. *United States v. White*, 984 F.3d 76, 80 (D.C. Cir. 2020); *see* Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (2010). Those changes did not apply retroactively. *White*, 984 F.3d at 80.

Congress subsequently authorized courts to grant retroactive relief through the First Step Act of 2018, which authorized sentencing courts to "impose a reduced sentence *as if* sections 2 and 3 of the Fair Sentencing Act * * * were in effect at the time the covered offense was committed." First Step Act, Pub. L. 115–391, § 404(b), 132 Stat. 5194, 5222 (2018) (emphasis added), 21 U.S.C. § 841 note (Application of Fair Sentencing Act); *see White*, 984 F.3d at 80 (The First Step Act "allow[ed] persons to seek reduced sentences if they committed certain 'covered offense[s]' * * * prior to the enactment of the Fair Sentencing Act.").

The First Step Act defines the "covered offense[s]" to which it applies as any "violation of a Federal Criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010[,] * * * that was committed before" the Fair Sentencing Act's enactment. 21 U.S.C. § 841 note (Application of Fair Sentencing Act). The Act underscores, though, that "[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section." *Id.*

6

## C

In 1995, a grand jury indicted Smith on 21 separate charges under federal law and the District of Columbia code, including drug distribution, murder, and kidnapping. The charges arose from Smith's role as an "enforcer" for the Fern Street Crew. A jury convicted Smith on all charges.

The then-mandatory Sentencing Guidelines required that Smith be sentenced to life imprisonment on several of his federal charges, including drug conspiracy under 21 U.S.C. § 846, RICO conspiracy under 18 U.S.C. §§ 1962(d) and 1963(a), and continuing criminal enterprise ("CCE") murder and kidnapping under 21 U.S.C. § 848. Based on the CCE convictions, Smith also received three twenty-year sentences and one five-year sentence for "crimes of violence" under 18 U.S.C. § 924(c), which ran consecutive to (*i.e.*, in addition to) his life sentences. Smith was separately sentenced to life without parole for his murder convictions under the District of Columbia Code.

On Smith's direct appeal, this court upheld all of Smith's convictions and his sentence, with the exception of one felony-murder conviction under the D.C. Code and one attempted robbery conviction. *United States v. Sumler*, 136 F.3d 188, 189 n.1 (D.C. Cir. 1998).

After the Supreme Court struck down Section 924(c)'s residual clause as unconstitutional, Smith filed a Section 2255 petition arguing that the four CCE convictions underlying his Section 924(c) convictions do not qualify as "crimes of violence" under Section 924(c)'s elements clause. *United States v. Smith*, 605 F. Supp. 3d 1, 15 (D.D.C. 2022). He argued that the elements of his underlying offenses did not

categorically require the actual, attempted, or threatened use of force against another. *Id.* at 17–24.

The government agreed with Smith that his federal kidnapping conviction could be accomplished without force and therefore did not satisfy the elements clause, and so the associated Section 924(c) conviction should be vacated. *Smith*, 605 F. Supp. 3d at 17. But the government argued that Smith's crime-of-violence convictions for CCE murder each satisfied Section 924(c)'s elements clause. *Id.* at 18.

The district court agreed with the government, vacating Smith's kidnapping "crime of violence" conviction but denying Smith's motion as to the three CCE-murder convictions. *Smith*, 605 F. Supp. 3d at 24. The court also read the CCE murder statute to require intentional action. In doing so, the court rejected Smith's argument that a conviction for CCE murder could be based on a *mens rea* of mere recklessness, which Smith claimed would not satisfy Section 924(c). *Id.* at 20–23. The court likewise rejected Smith's arguments that a conviction for CCE murder could be accomplished without the use of force. *Id.* at 23–24. The district court subsequently granted Smith a certificate of appealability as to these rulings.

While Smith's Section 2255 petition was pending in district court, Smith also filed a motion for a sentence reduction under Section 404(b) of the First Step Act. He argued that several of his convictions were "covered offenses," and that resentencing on any of them could justify resentencing on several of his other convictions.

The district court denied Smith's motion in full. *United States v. Smith*, No. 95-cr-154, 2022 WL 10449599, at *17 (D.D.C. Oct. 17, 2022). The court concluded that only Smith's

convictions for drug distribution conspiracy and RICO conspiracy were eligible for sentence reductions under the First Step Act. *Id.* at *8–10. The court then declined to reduce Smith's sentences on those convictions due to (1) the "seriousness" of Smith's offense conduct, (2) his "terrible behavioral record while incarcerated," (3) the irrelevance of Smith's sentences on these convictions to his expected carceral term given his concurrent life sentences, and (4) the "strong practice against the issuance of advisory opinions[.]" *Id.* at *15. In addition, the court held that it lacked the authority to reopen Smith's sentences as to non-covered offenses. *Id.* at *11–13.

Smith appeals both the denial of his Section 2255 petition to vacate his crime-of-violence convictions and the denial of a sentence reduction under the First Step Act.

## II

The district court had jurisdiction under 28 U.S.C. § 2255(a) and under Section 404 of the First Step Act. We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. §§ 1291 and 2255(d).

As to Smith's Section 2255 motion, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Askew*, 88 F.3d 1065, 1070 (D.C. Cir. 1996). For Smith's First Step Act motion, we review questions of statutory interpretation *de novo*. *White*, 984 F.3d at 85. Our review of the ultimate choice of whether to grant a sentence reduction is "deferential" and "should not be overly searching." *Concepcion v. United States*, 597 U.S. 481, 501 (2022).

9

**III**

**A**

At the outset, the Government urges us to reject Smith's challenges to his Section 924(c) convictions without reviewing the merits under the "concurrent-sentence doctrine." Specifically, the Government argues that, because Smith's twenty-year sentences for his Section 924(c) convictions would begin to run only *after* Smith's multiple life sentences, vacatur of those convictions would offer Smith no practical relief.

As its name suggests, the concurrent-sentence doctrine relates primarily to challenges to sentences, not convictions. *United States v. Agramonte*, 276 F.3d 594, 598 (D.C. Cir. 2001). Because a conviction ordinarily carries consequences beyond the term of imprisonment, the concurrent-sentence doctrine has had no place in direct appeals of *convictions*, rather than sentences. *See Ray v. United States*, 481 U.S. 736, 737 (1987) (rejecting application of "concurrent-sentence" doctrine to challenges to multiple convictions, since each conviction carried independent $50 assessments); *see also Agramonte*, 276 F.3d at 598 (noting that *Ray* "spelled the death knell for the concurrent sentence doctrine as applied to review of convictions").

Nevertheless, some courts have extended the doctrine to habeas challenges when a defendant's overlapping sentences mean that even a successful challenge to one conviction may not result in any reduction in custody. *See, e.g.*, *Ruiz v. United States*, 990 F.3d 1025, 1033 (7th Cir. 2021). That extension has not been without controversy. *See id.* at 1035–1041 (Wood, J., dissenting) (arguing the doctrine has no application to habeas challenges to convictions).

We need not wade into that debate here because the government forfeited its concurrent-sentence argument by failing to raise it before the district court. *See Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 483 (D.C. Cir. 2007) ("[A]bsent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in the proceedings below.") (quoting *Grant v. United States Air Force*, 197 F.3d 539, 542 (D.C. Cir. 1999)); *Krieger v. Fadely*, 211 F.3d 134, 135 (D.C. Cir. 2000) ("[N]eglect in the district court at least 'forfeited' [the] right to raise the issue in this court.") (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

In addition, the government affirmatively argued below that one of Smith's Section 924(c) convictions (for kidnapping) should be vacated, and the district court agreed. *Smith*, 605 F. Supp. 3d at 17–18. That position is inconsistent with the government's invocation of the concurrent-sentence doctrine here.

Worse still, the primary *reason* for the concurrent-sentence doctrine is to "conserve judicial resources[.]" *Kassir v. United States*, 3 F.4th 556, 561–562 (2d Cir. 2021); *see Ruiz*, 990 F.3d at 1033. Yet due to the government's tardiness in raising the issue, Smith's substantive legal challenges already were extensively briefed below and addressed by the district court in a thorough opinion. They have now also been fully briefed and argued in this court. Any opportunity to conserve judicial resources has long since passed. *See United States v. Benton*, 24 F.4th 309, 315–316 (4th Cir. 2022) (rejecting government's request to apply concurrent-sentence doctrine in similar circumstances where the argument was not raised before the district court).

Even were the issue preserved, the Government and all circuits to have considered the doctrine in this context agree that the doctrine is discretionary. Gov't Br. 22–25; *Benton*, 24 F.4th at 315 (describing the doctrine as "purely discretionary") *Kassir*, 3 F.4th at 565 (likewise describing the doctrine as "discretionary"); *Ruiz*, 990 F.3d at 1033 (similar); *Duka v. United States*, 27 F.4th 189, 191 (3d Cir. 2022) (similar). Under the circumstances presented in this case, where the doctrine's application has been forfeited and its purpose of judicial economy is not in any way furthered, we find no good reason for deciding the doctrine's applicability in a novel context.

**B**

Turning to the merits, Smith makes two arguments for vacating his Section 924(c) convictions. First, he argues that his convictions do not categorically require proof of the use, attempted use, or threatened use of force. Second, he argues that the convictions lack the necessary *mens rea* for force "against" another under *Borden v. United States*, 593 U.S. 420 (2021). Neither argument succeeds.

**1**

**a**

By way of reminder, to qualify as a "crime of violence" under Section 924(c)'s elements clause, the felony of conviction must "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another[.]" 18 U.S.C. § 924(c)(3)(A). Because CCE murder applies only in cases where an intentional killing takes place, the plain text of the statute categorically requires the use of physical force against another.

The CCE murder statute applies to those who "intentionally kill": conduct that necessarily involves the use of force against the victim. 21 U.S.C. § 848(e)(1)(A). It also applies to those who, while not themselves directly employing deadly force, "counsel[], command[], induce[], procure[], or cause[] the intentional killing of an individual" when "such killing results." *Id.* Congress added those additional grounds of culpability "to reach the 'top brass'" who order killings, "not [just] the lieutenants and foot soldiers" who carry out the orders. *Garrett v. United States*¸ 471 U.S. 773, 781 (1985).

Either way—whether the defendant "intentionally kills" a victim or instead "counsels, commands, induces, procures, or causes the intentional killing of an individual"— he cannot be convicted for CCE murder unless the desired "[intentional] killing results[.]" 21 U.S.C. § 848(e)(1)(A). By mandating that an "*intentional* killing" occur, the statute necessarily requires proof that the defendant, in one way or another, caused physical force to be used on the victim. *See, e.g.*, *United States v. Aguilar*, 585 F.3d 652, 661–662 (2d Cir. 2009) (sustaining a Section 924(c) enhancement for CCE murder for a defendant who "procure[d]" or "induced" the murder of a former romantic partner by offering to forgive the killers' drug debts upon commission of the crime). That also comports with the statutory purpose of ensuring that the law punishes with equal severity those who order the use of murderous force as those who follow their bidding.[2]

---

[2] The requirement that the "intentional killing [in fact] result[]" differentiates a conviction under 21 U.S.C. § 848(e)(1)(A) from various "murder-for-hire" cases cited by Smith that do not require that any killing actually occur, let alone an intentional one. Smith Opening Br. 30; *see United States v. Bowman*, 873 F.3d 1035, 1042

In declining Smith's invitation to write into Section 924(c) a requirement that the defendant himself be the one to use force, we are in good company. Eleven out of eleven courts of appeals to have addressed the question have held that "aiding and abetting a crime of violence is [itself] a crime of violence." *United States v. Worthen*, 60 F.4th 1066, 1070 (7th Cir. 2023); *see United States v. Garcia-Ortiz*, 904 F.3d 102, 109 (1st Cir. 2018); *Medunjanin v. United States*, 99 F.4th 129, 135 (2d Cir. 2024); *United States v. Stevens*, 70 F.4th 653, 661–662 (3d Cir. 2023); *United States v. Ali*, 991 F.3d 561, 573–574 (4th Cir. 2021); *United States v. Hill*, 63 F.4th 335, 363 (5th Cir. 2023); *United States v. Richardson*, 948 F.3d 733, 741–742 (6th Cir. 2020); *Kidd v. United States*, 929 F.3d 578, 581 (8th Cir. 2019); *Young v. United States*, 22 F.4th 1115, 1122–1123 (9th Cir. 2022); *United States v. Bailey*, 972 F.3d 1179, 1182–1183 (10th Cir. 2020); *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016).

So too here: A person who "counsels, commands, induces, procures, or causes the intentional killing of an individual" that then "results" necessarily participates in the physical force that causes the intended death, 21 U.S.C. § 848(e)(1)(A).

---

(8th Cir. 2017) (Murder-for-hire conviction that does not require showing that a murder in fact occurred would not qualify as a crime of violence "because it does not have 'as an element the use, attempted use, or threatened use of physical force against the person or property of another.'") (quoting 18 U.S.C. § 924(e)(2)(B)(i)). *Compare* 18 U.S.C. § 1958(a) (making it a crime punishable by a maximum of 20 years to "travel[] in or cause[] another * * * to travel in interstate or foreign commerce * * * with *intent that a murder be committed*") (emphasis added), *with id.* (raising the maximum penalty to life imprisonment or the death penalty only when "death results").

14

**b**

Smith disputes that intentionally causing another's death always requires force. He suggests, for instance, that poisoning another would not involve the "use of physical force against the person or property of another[.]" *See* Smith Opening Br. 28–29. He also proposes that killings accomplished through omissions (such as by intentionally withholding food or medicine) do not involve the "use of physical force." Smith Opening Br. 29; Smith Reply Br. 19–20.

Both arguments are incorrect. As for the poisoning example, we have already held that poisoning someone counts as using physical force "because the bodily injury caused by the poison would necessarily involve the use of force within the common law meaning[.]" *Carr*, 946 F.3d at 604; *see id.* (applying use-of-force provision in U.S.S.G. § 4B1.2(a)(1), which defines "crime of violence" to mean any crime punishable by more than one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another"); *see also Johnson v. United States*, 559 U.S. 133, 140 (2010) ("'[P]hysical force' means * * * force capable of causing physical pain or injury to another person."); WAYNE R. LaFAVE, SUBSTANTIVE CRIMINAL LAW § 16.2(b) (2d ed. 2003) (Common law force "need not be applied directly to the body of the victim," and may be used "by administering a poison or * * * even by resort to some intangible substance.").

The Supreme Court has said as much as well. In applying an analogous use of "force" provision in *United States v. Castleman*, 572 U.S. 157 (2014), the Court explained that the "common-law concept of 'force' encompasses even its indirect application[,]" *id.* at 170, and "need not be applied directly to the body of the victim[,]" *id.* (quoting LaFAVE, *supra*

§ 16.2(b)); *see id.* (interpreting 18 U.S.C. § 921(a)(33)(A), which provides that the crime of domestic violence includes an offense that "has, as an element, the use or attempted use of physical force"). In this sense, "physical force" means "simply 'force exerted by and through concrete bodies,' as opposed to 'intellectual force or emotional force.'" *Id.* (quoting *Johnson*, 559 U.S. at 138). In so holding, the Supreme Court was explicit that the use-of-force requirement could be satisfied through use of poison, infection with disease, or "'resort to some intangible substance,' such as a laser beam." *Id.* (quoting LaFave, *supra*, § 16.2(b)).

In short, precedent from both the Supreme Court and this court close the door on Smith's proposed distinction between direct force (such as striking someone) and indirect force (such as poisoning them).

Smith's action-omission distinction fares no better. Smith hypothesizes that someone might cause an intentional death by omission—such as by depriving someone of food or vital medicine—and thereby commit CCE murder without in fact acting to use "force." Smith Opening Br. 29–30; Smith Reply Br. 19–21.

But intentionally withholding food or medicine with the object of causing another person's death—whether styled as an "omission" or otherwise—involves deliberately causing bodily injury through physical processes. And that, the Supreme Court has held, counts as using force. *Castleman*, 572 U.S. at 170 ("It is impossible to cause bodily injury without applying force[.]"); *see Johnson*, 559 U.S. at 140 (understanding violent force in terms of the "capa[city] [to] caus[e] physical pain or injury to another person"); *Carr*, 946 F.3d at 604 ("[I]f [the defendant's use of] poison causes bodily injury, then the defendant has necessarily used force because '[i]t is impossible

to cause bodily injury without applying force in the common-law sense.'") (quoting *Castleman*, 572 U.S. at 170).

Leading criminal law treatises agree. *See* LAFAVE, *supra*, § 16.2(b) (Battery "may be committed, if the other elements of the crime are present, *by creating a situation under which the victim injures himself \* \* \* or even by a simple omission to act* where there is a duty to act[.]") (emphasis added); *id.* § 16.2 (stating that "[c]riminal battery, sometimes defined briefly as the unlawful application of force to the person of another[,] \* \* \* [includes] the defendant's conduct (*act or omission*)") (emphasis added); WILLIAM L. BURDICK, THE LAW OF CRIME § 1.09 (1946) ("[S]ome very serious crimes may be committed by an omission to perform a legal duty[,]" including "even murder.").[3]

In concluding that a deliberate omission that results in an intentional killing necessarily involves the use of force, we join the law of eight other circuits. *See United States v. Baéz-Martinez*, 950 F.3d 119, 132 (1st Cir. 2020) ("[A] *serious* bodily injury must necessarily entail violent force under *Castleman*'s reasoning of 'injury, ergo force.'"); *United States v. Scott*, 990 F.3d 94, 108 (2d Cir. 2021) (en banc) ("The possibility of a defendant committing the crime by omission warrants no different conclusion" as to whether an intentional killing involves force.); *United States v. Rumley*, 952 F.3d 538,

---

[3] Similarly, in discussing murder, the LaFave treatise is explicit that "intentional death may be effectively brought about by an omission to act \* \* \* [when] there is a duty to act," such as where a parent fails to rescue a drowning child in the bathtub, intending that the child die. LAFAVE, *supra*, § 14.2(c); *see* BURDICK, *supra*, § 1.09 ("Intent to take life, whether by an act of omission or commission, distinguishes murder from manslaughter.").
.

551 (4th Cir. 2020) ("[T]here is just as much a 'use of force' when a murderous parent uses the body's need for food to intentionally cause his child's death as when that parent uses the forceful physical properties of poison to achieve the same result."); *United States v. Harrison*, 54 F.4th 884, 889 (6th Cir. 2022) ("[I]n every murder, the murderer uses physical force in some way to cause a death. That's true even when murder is carried out by omission rather than commission."); *United States v. Waters*, 823 F.3d 1062, 1066 (7th Cir. 2016) ("[W]ithholding medicine causes physical harm, albeit indirectly, and thus qualifies as the use of force under *Castleman*."); *United States v. Peeples*, 879 F.3d 282, 287 (8th Cir. 2018) ("Because it is impossible to cause bodily injury without force, it would also be impossible to cause death without force" even through omission); *United States v. Ontiveros*, 875 F.3d 533, 538 (10th Cir. 2017) (noting that "omission to act where there is a duty to act" may qualify as force) (quoting LAFAVE, *supra*, § 16.2(b)); *United States v. Jones*, 906 F.3d 1325, 1329 (11th Cir. 2018) ("[I]ndirect physical force—through the use of poison or other means—still qualifies as violent physical force under the ACCA elements clause.").

Smith points to the Third Circuit's decision in *United States v. Mayo*, 901 F.3d 218 (3rd Cir. 2018), which held that Pennsylvania's aggravated assault statute did not satisfy the ACCA's use-of-force requirement when applied to acts of omission, *id.* at 230. That decision, though, turned largely on the court's understanding of the term "physical force * * * *as interpreted by Pennsylvania courts*." *Id.* at 227 (formatting modified; emphasis added). But how Pennsylvania courts understand the term "force"—and, specifically, whether a requirement that the defendant deliberately cause bodily injury necessarily involves "force" for state-law purposes—has no bearing on the question of what "physical force" means in a

federal statute.  *See Johnson*, 559 U.S. at 138 ("The meaning of 'physical force' in [the ACCA] is a question of federal law, not state law.").

To the extent the Third Circuit also considered federal law, the court brushed past *Castleman*'s treatment of common-law "force" as irrelevant to understanding "force" in ACCA's violent felony provisions.  *Mayo*, 901 F.3d at 228–229.  Yet *Castleman*'s treatment of "physical force" as "force exerted by and through concrete bodies" was drawn straight from *Johnson*'s discussion of the same term in the context of violent felonies.  *Castleman*, 572 U.S. at 170 (citing *Johnson*, 559 U.S. at 138).  That shared understanding of force as involving the intentional causation of physical processes does not distinguish between "direct versus indirect" force or action versus omission.  *Id.*

In sum, whatever degree of force Section 924(c) requires, intentionally causing an intentional killing necessarily meets the statute's requirement that force be used against another person.  That remains true whether the force is used "directly" or "indirectly," or is accomplished through action or omission.  Because the CCE-murder statute requires the defendant to bring about another person's intentional killing, it categorically requires force within the meaning of Section 924(c).[4]

---

[4] Smith also invokes the Sixth Circuit's decision in *United States v. Burris*, 912 F.3d 386 (6th Cir. 2019).  Smith Opening Br. 29–30; Smith Reply Br. 19–20.  But *Burris* is not on point.  There, the Sixth Circuit found that a conviction under an Ohio aggravated-assault statute did not categorically require force because "there [wa]s at least a 'realistic probability' that a person may be convicted * * * [under it for inflicting] certain *serious mental harms* without using physical force[.]"  *Burris*, 912 F.3d at 399 (emphasis added).

**2**

Smith separately argues that the CCE-murder statute can be satisfied with a *mens rea* of mere recklessness, and that it therefore cannot qualify as a crime of violence. That is incorrect.

To begin, the Supreme Court has held that the analogous use-of-force clause in the ACCA's "violent felony" provision requires a *mens rea* higher than recklessness. *Borden*, 593 U.S. at 429 (plurality opinion); *id.* at 446 (Thomas, J., concurring in the judgment). Because Section 924(e)'s definition of "violent felony" requires that force be directed "against the person of another[,]" the plurality opinion concluded that the statute "demands that the perpetrator direct his action at, or target, another individual"—a level of purpose that excludes recklessness. *Id.* at 429 (plurality opinion). Concurring in the judgment, Justice Thomas reasoned that the ACCA's reference to the "use of physical force * * * has a well-understood meaning applying only to intentional acts designed to cause harm[.]" *Id.* at 446 (Thomas, J., concurring in the judgment) (quoting *Voisine v. United States*, 579 U.S. 686, 713 (2016) (Thomas, J. dissenting)). As relevant here, five Justices agreed that a *mens rea* of mere recklessness cannot support a "violent felony" conviction under the ACCA.

Under either the plurality's approach or Justice Thomas's, a crime that may be committed with merely reckless conduct is

---

The CCE-murder statute, by contrast, requires that an "intentional killing" results and so cannot be satisfied with psychological harms alone. 21 U.S.C. § 848(e)(1)(A); *see Johnson*, 559 U.S. at 138 ("distinguishing physical force from, for example, intellectual force or emotional force").

not a crime of violence under the ACCA. *Borden*, 593 U.S. at 434 (plurality opinion); *id.* at 446 (Thomas, J., concurring in the judgment); *see United States v. Epps*, 707 F.3d 347, 348 (D.C. Cir. 2013) (When the Supreme Court issues a fractured ruling, its holding consists of a "common denominator of the Court's *reasoning* * * * embody[ing] a position implicitly approved by at least five Justices who support the judgment.") (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991)).

Both parties agree with that bottom-line holding and that it applies to the almost-identically worded Section 924(c). Smith Opening Br. 27; Gov't Br. 16. We agree as well, joining the decisions of seven other circuits. *See United States v. Jordan*, 96 F.4th 584, 589 (3d Cir. 2024); *United States v. Manley*, 52 F.4th 143, 147 (4th Cir. 2022); *United States v. States*, 72 F.4th 778, 791 n.11 (7th Cir. 2023); *Janis v. United States*, 73 F.4th 628, 630–631 (8th Cir. 2023); *United States v. Begay*, 33 F.4th 1081, 1092–1093 (9th Cir. 2022); *United States v. Kepler*, 74 F.4th 1292, 1303–1304 (10th Cir. 2023); *Alvarado-Linares v. United States*, 44 F.4th 1334, 1344 (11th Cir. 2022). Accordingly, for the CCE-murder statute to satisfy Section 924(c)'s elements clause, a more culpable *mens rea* than mere recklessness is required.

The next step is to determine which *mens rea* applies to the CCE-murder statute. That task is a straightforward matter of statutory construction. *See Staples v. United States*, 511 U.S. 600, 605 (1994) ("[D]etermining the mental state required for commission of a federal crime requires 'construction of the statute and * * * inference of the intent of Congress.'") (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922)); *see also Borden*, 593 U.S. at 429–445 (exhaustively considering ACCA's text, structure, and context to determine appropriate *mens rea*).

Because we are construing a criminal law, the starting point for our analysis is "the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded." *Staples*, 511 U.S. at 605 (formatting modified); *see United States v. Project on Gov't Oversight*, 616 F.3d 544, 549 (D.C. Cir. 2010) ("We must presume that criminal statutes and regulations contain a *mens rea* element unless otherwise clearly intimated in the language or legislative history.") (brackets omitted) (quoting *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008)).

In other words, our job is not to construe the CCE murder statute's words in a vacuum; it is to decide which *mens rea* applies. That will ordinarily be one of the "four states of mind"—purpose, knowledge, recklessness, or negligence—set out by the Model Penal Code and subsequently "described in modern statutes and cases." *Borden*, 593 U.S. at 426; *see Counterman v. Colorado*, 600 U.S. 66, 78–79 (2023) (explaining each of these four mental states); MODEL PENAL CODE § 2.02 (Am. L. Inst. 1985).

For present purposes, there is no disagreement that, when Congress uses the word "intentional" as a *mens rea* in a criminal statute, that equates at least with purpose, and may also cover both purposeful and knowing actions. *See, e.g.*, *Voisine*, 579 U.S. at 693 (referring to distinct "mental state[s] of intention, knowledge, or recklessness"); *id.* at 691–692 (distinguishing acting "knowingly * * * [meaning] 'aware that harm is practically certain,'" from acting "intentionally * * * sometimes called 'purposefully' * * * [meaning] hav[ing] that result as a 'conscious object'"); *Morissette*, 342 U.S. at 271 (distinguishing between the "mental element * * * [of] knowledge or [of] intent"); MODEL PENAL CODE, *supra*, § 2.02 cmt. 2, 233 (The Code's "narrow distinction between acting purposely and knowingly" aims to clarify "ambiguity in legal

usage of the term 'intent'"); *id.* at 235 n.11 (canvassing recent criminal enactments or proposals that use "the term 'intentionally' where the [Model Penal] Code uses purposely").

And federal courts are uniform that an "intentional" *mens rea* does not include reckless conduct. *See, e.g.*, *Borden*, 593 U.S. at 438 (distinguishing crimes that "'involve the intentional use' of force * * * [from] crimes of recklessness"); *id.* at 446 (Thomas, J., concurring) (distinguishing "a crime that can be committed through mere recklessness" from those involving "intentional acts designed to cause harm"); *id.* at 462 (Kavanaugh, J., dissenting) (likewise distinguishing situations where "[a] person acts intentionally (or said otherwise purposefully)" from situations where "a person acts recklessly"); *Voisine*, 579 U.S. at 692 (distinguishing between "[r]eckless assaults" and "knowing or intentional ones").[5]

With that backdrop in mind, the relevant provision of the CCE murder statute, 21 U.S.C. § 848(e)(1)(A), requires an intentional *mens rea* across its inculpatory actions for three reasons.

---

[5] *See also, e.g.*, *United States v. Burke*, 888 F.2d 862, 867 (D.C. Cir. 1989) (distinguishing between "'intentional' wrongdoing" and "'reckless or criminally negligent' conduct"); *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) ("Reckless conduct in the criminal law is thus distinct from intentional conduct[.]"); *United States v. Devereaux*, 91 F.4th 1361, 1364 (10th Cir. 2024) (distinguishing "intentional (purposeful and knowing)" conduct from "reckless" conduct); *see also* LAFAVE, *supra*, § 5.2 ("Intent has traditionally been defined to include knowledge," although "[t]he modern view * * * is that it is better to draw a distinction between intent (or purpose) on the one hand and knowledge on the other.")

*First*, the CCE-murder statute is not silent as to *mens rea*. The statute uses a variant of the word "intentional" not once but twice. At the outset, it applies when someone "*intentionally* kills" another. 21 U.S.C. § 848(e)(1)(A) (emphasis added). It also applies when someone "counsels, commands, procures, or causes" an "*intentional* killing[.]" *Id.* (emphasis added). In addition, the statute includes a third reference to intentionality when it specifies that "*such* killing"—meaning the "intentional killing" procured, induced, commanded, or caused—actually results. *Id.* (emphasis added).

Congress's use of the word "intentionally" even once would commonly suffice to establish that *intentional action*, rather than reckless action, is required for the listed criminal actions. *See, e.g.*, *Ruan v. United States*, 597 U.S. 450, 458 (2022). That is because, when construing a criminal statute's *mens rea* element, "a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that 'separate wrongful from innocent acts.'" *Id.* (quoting *Rehaif v. United States*, 588 U.S. 225, 232 (2019)); *Rehaif*, 588 U.S. at 229 ("When a statute 'prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears.'") (quoting MODEL PENAL CODE, *supra*, § 2.02(4)); *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element."); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994) (similar).

Keep in mind that our statutory-construction task is to identify the most plausible *mens rea*. *Staples*, 511 U.S. at 605.

When, as here, Congress has already supplied a particular *mens rea*—and did so here twice explicitly and once indirectly—the logical reading is that the statutorily designated *mens rea* extends to each means of committing the same crime. *See X-Citement*, 513 U.S. at 70 (interpreting a statute's use of the word "knowingly" before the phrase "transports or ships" to apply to the content of the things being transported or shipped, even when those were described in a separate conditional clause); *Flores-Figueroa*, 556 U.S. at 652–653 (collecting cases where the Court has interpreted criminal statutes in this way). And that rule applies regardless of whether the "most natural grammatical reading" of the statute might suggest otherwise. *X-Citement Video*, 513 U.S. at 70; *cf. Ruan*, 597 U.S. at 458 ("Unsurprisingly, given the meaning of scienter, the *mens rea* we have read into [silent] statutes is often that of knowledge or intent.").

In other words, when Congress explicitly provides a *mens rea* in a criminal statute, the most faithful reading of statutory text, absent contrary indicia, is to apply that *mens rea* to all relevant culpable acts, rather than to divine a lesser *mens rea* that lacks any textual basis. It is, after all, Congress's job to define what conduct is criminal, and not for courts to expand that coverage more broadly by adding a lesser *mens rea*.

*Second*, the actions that Section 848(e)(1)(A) proscribes themselves connote intentionality, not recklessness. To "command" a killing means to direct or order it; to "counsel" a killing means to urge or advise in favor of it; and to "procure" a killing means to deliberately bring it about. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 518 (1993) (def. 2) (defining "to counsel" to mean "to recommend esp[ecially] as the best or most expedient act, course, or policy"); *id.* at 455 (def. 1) (defining "to command" to mean "to direct authoritatively" or to "order"); *id.* at 1154 (def. 1a) (defining

"to induce" to mean "to move and lead (as by persuasion or influence)," to "influence," or to "persuade"); *id.* at 1809 (def. 2a) (defining "to procure" to mean "to bring about by particular care or effort" or "to bring about by scheming and plotting").

As for "causes," actions that "bring into existence" an intentional killing or "make" one happen also fit the mold of intentional actions. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 356 (def. 1) (defining "to cause" as meaning "to serve as cause or occasion of"; to "bring into existence"; to "make"). While some other definitions could, considered in isolation, reach more broadly, they do not come into play here. Settled statutory construction principles require that "cause" be read consonantly with the verbs that surround it, each of which speaks to intentional actions. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). And read as a whole, the list of verbs identifies equivalent alternative paths to "intentionally kill[ing]" someone, and each takes as its object "an intentional killing." 21 U.S.C. § 848(e)(1)(A).

So in addition to the statute's multiple explicit requirements of "intentional" action, each of Section 924(c)'s verbs speak in "the language of intent," even absent "the word 'intent'" itself, and so "strongly intimate a[n] [intentional] *mens rea* requirement." *Project on Gov't Oversight*, 616 F.3d at 550; *see id.* (A statute that uses such words "is not truly silent on the issue" even when it "does not include the word 'intent[.]'").

*Third*, statutory context redoubles the necessity of a greater-than-reckless *mens rea* for each of Section 848(e)(1)(A)'s culpable actions. A CCE-murder conviction carries a mandatory minimum sentence of twenty years and

may result in a death sentence or life in prison. 21 U.S.C. § 848(e)(1)(A). In *Borden*, the Supreme Court cautioned against an interpretation "that would trigger ACCA's 15 year minimums" for merely reckless crimes. 593 U.S. at 440. *Borden*'s logic similarly militates against interpreting a death-eligible statute with a twenty-year minimum sentence to cover reckless conduct—especially given Congress's repeated textual requirement of intentional action. *Id.*

Smith hypothesizes that a person could theoretically "command an intentional killing" without in fact intending it. Smith Opening Br. 25. For instance, a mob boss might order a lieutenant to "take care of Jones"—perhaps intending merely that the subordinate caution or threaten Jones, or even send him a care package—and thereby "command" Jones's intentional killing by the subordinate without personally intending that Jones be killed.

While the mob boss's actions could comfortably qualify as commanding that Jones be threatened, it is doubtful that the words without more amount to the mob boss "commanding" an "intentional killing[.]" 21 U.S.C. § 848(e). Anyhow, the statutory text already makes clear which *mens rea* should apply, and courts should not contort the statute's every word so as to hypothesize one or two strained applications as an excuse for pulling some extra-textual *mens rea* out of the air.

Against these textual signs that 21 U.S.C. § 848(e)(1)(A) requires an intentional *mens rea*, Smith marshals a single case from the Sixth Circuit. But that case is not on point.

In *United States v. Alvarez*, 266 F.3d 587 (6th Cir. 2001), the Sixth Circuit upheld a CCE-murder conviction where the jury was instructed that "'intentional killing' could be read to include 'intentionally inflicting serious bodily injury,'

'intentionally engaging in conduct intending the victim be killed or that lethal force be employed against the victim,' and 'intentionally engaging in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and resulting in death to the victim,'" *id.* at 594–595 (brackets omitted).

The language on which Smith relies was drawn from the jury charge outlining certain since-repealed statutory "aggravating factors for a death penalty determination," *Alvarez*, 266 F.3d at 595; *see* 21 U.S.C. § 848(n)(1) (2000), not a description of the CCE-murder statute's *mens rea* requirement. There was no argument in *Alvarez* that the CCE-murder statute itself could be satisfied by mere recklessness, and the court's language instead repeatedly indicated that the statute requires an "intentional killing." 266 F.3d at 594–595.

Finally, Smith's invocation of the rule of lenity does not help. *See* Smith Opening Br. 32. That rule applies only when a criminal statute is ambiguous after exhausting traditional tools of statutory construction. *See Lockhart v. United States*, 577 U.S. 347, 361 (2016). Here, the statutory text is most naturally read as requiring the *mens rea* of intent that Congress repeatedly wrote into the law. In addition, lenity principles cut *against* Smith's argument, which would criminalize a broader range of conduct.

\* \* \*

Because the CCE-murder statute requires the intentional use of force against another person that results in an intentional killing and uses intent-connoting verbs to define the culpable content, the provision qualifies categorically as a crime of violence under 18 U.S.C. § 924(c). We accordingly deny Smith's Section 2255 petition to vacate those convictions.

**C**

Smith separately asks us to reverse the district court's denial of resentencing under the First Step Act. We decline that invitation. The district court correctly concluded that Smith was eligible for resentencing under the First Step Act on only two of his convictions, and it then offered sufficient reasons for its decision to decline resentencing as to those convictions.

**1**

The First Step Act permits district courts to "impose a reduced sentence" for defendants previously sentenced on certain "covered offenses." 21 U.S.C. § 841 note (Application of Fair Sentencing Act). A "'covered offense' means a violation of a [f]ederal criminal statute, the statutory penalties for which were modified by * * * the Fair Sentencing Act of 2010 * * * [and] that was committed before August 3, 2010." *Id.* In other words, the statute empowers district courts to give reduced sentences for convictions that predated the 2010 Fair Sentencing Act but which, if obtained after that Act, would have carried lower penalties.

As both parties agree, Smith's convictions for conspiracy to distribute crack cocaine in violation of 21 U.S.C. §§ 841 and 846 and a related RICO-conspiracy charge in violation of 18 U.S.C. § 1962(d) are eligible for reduction under the First Step Act. That is because the Fair Sentencing Act changed the punishments for Section 841 violations. Fair Sentencing Act §§ 2–3, 124 Stat. at 2372; *Smith*, 2022 WL 10449599, at *8; *see also Terry v. United States*, 593 U.S. 486, 493 (2021); *White*, 984 F.3d at 86 ("[T]he Fair Sentencing Act "modified the statutory penalties for [certain offenses] * * * because it

changed the quantity of crack cocaine necessary to trigger the penalties for those violations.").

At the time Smith was convicted for distributing at least 50 grams of crack cocaine, that conviction carried penalties of ten years to life imprisonment. 21 U.S.C. § 841(b)(1)(A)(iii) (1988). But as modified by the Fair Sentencing Act, at least 280 grams are now required to trigger the same penalties. 21 U.S.C. § 841(b)(1)(A)(iii) (2018). In contrast, Smith's conviction for distribution of 50 grams would now be punishable by five to 40 years. *Id.* § 841(b)(1)(B)(iii).

Similarly, the statutory maximum penalty for RICO conspiracy is ordinarily twenty years. 18 U.S.C. § 1963(a). But that maximum increases to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." *Id.* The first overt act underlying Smith's RICO conspiracy charge was the crack cocaine distribution conspiracy described above. *Smith*, 2022 WL 10449599, at *8. Accordingly, "[w]ere [Smith] convicted of a RICO conspiracy involving the same overt acts today, the maximum sentence he could receive by statute would be 20 years, not life." *Id.*

Smith argues that his CCE-murder convictions also qualify as covered offenses eligible for resentencing under the First Step Act. Not so.

Whether an offense is "covered" under the First Step Act "depends only on whether the defendant was convicted of an offense with a statutory penalty range that the Fair Sentencing Act altered." *White*, 984 F.3d at 86. Before 2010, the CCE-murder statute authorized prison terms from twenty years to life, or the death penalty. *See* 21 U.S.C. § 848(e)(1)(A) (2006). "After 2010, these statutory penalties remain exactly the

same." *Terry*, 593 U.S. at 493; *see* 21 U.S.C. § 848(e)(1)(A) (2018). The relevant sections of the Fair Sentencing Act simply do not concern or reference CCE murder. *See* Fair Sentencing Act, §§ 2–3, 124 Stat. at 2372.

Indeed, every circuit court to consider the question has held that CCE murder is not a "covered" offense under the First Step Act. *See United States v. Roane*, 51 F.4th 541, 546–551 (4th Cir. 2022) ("[T]he statutory penalties associated with [defendants'] § 848(e)(1)(A) convictions remain the same both before and after the Fair Sentencing Act—a 20-year minimum sentence up to life imprisonment or death for drug-related murder."); *see also United States v. Fletcher*, 997 F.3d 95, 97 (2d Cir. 2021); *United States v. Junius*, 86 F.4th 1027, 1030–1031 (3d Cir. 2023); *United States v. Snow*, 967 F.3d 563, 564–565 (6th Cir. 2020).

Smith nonetheless argues that CCE murder is covered because it requires that the murder defendant "engag[ed] in or work[ed] in furtherance of a continuing criminal enterprise," or else "engage[d]" in certain predicate offenses. 21 U.S.C. § 848(e)(1)(A). Smith argues that the Fair Sentencing Act *did* change the statutory penalties for the relevant predicate in his case—the "continuing criminal enterprise" charged against a co-defendant, J.A. 78–79—because that specific continuing criminal enterprise was itself based in part on the drug distribution conspiracy charge that all parties agree is a covered offense under the Fair Sentencing Act. *Smith*, 2022 WL 10449599, at *8; Smith Opening Br. 41–46.

That argument fails under its own premises. Even if the predicate continuing criminal enterprise mattered, Smith is incorrect that the Fair Sentencing Act modified the statutory penalties associated with engaging in a continuing criminal enterprise.

A person engages in a continuing criminal enterprise by (1) violating *any* of the felony drug offenses contained in Chapter 13 of Title 21, if (2) that violation "is a part of a continuing series of violations" from which the defendant "obtains substantial income or resources" and (3) the defendant's violations are "undertaken * * * in concert with five or more other persons" as to whom the defendant plays a management role. 21 U.S.C. § 848(c). Engaging in such a "continuing criminal enterprise" is punishable by twenty years to life. *Id.* § 848(a). As with CCE murder, the penalty for engaging in a continuing criminal enterprise was in no way changed by the Fair Sentencing Act.

Smith is right that one of the felony drug offenses used to establish the existence of a continuing criminal enterprise in this case happens to have been the conspiracy to distribute at least 50 grams of crack cocaine, an offense that was altered by the Fair Sentencing Act. Fair Sentencing Act § 2, 124 Stat. at 2372. But even as modified by the Fair Sentencing Act, conspiracy to distribute 50 grams of crack cocaine is *still* a predicate felony for CCE murder. *See* 21 U.S.C. § 841(b)(1)(B)(iii); *id.* §§ 846, 848(e)(1)(A). And a continuing criminal enterprise charge may be based on any drug violation that is a felony, regardless of the punishment for that violation. *See id.* § 848(c)(1). So the fact that the penalties for one of the predicates of the continuing criminal enterprise charged in this case was itself a covered offense does not matter because the exact offense charged could still serve as a valid CCE predicate today. The Fair Sentencing Act changed nothing about that.

In any event, Smith was not independently charged with engaging in a continuing criminal enterprise. To convict Smith of CCE murder, the jury was required to find only that Smith "intentionally killed" (or "counseled, commanded, induced, procured, or caused" the intentional killing of) the victim,

intended to do so, and did so "while engaged in or working in furtherance of a continuing criminal enterprise." J.A. 221. While Smith needed to be "engag[ed] in or working in furtherance of" the enterprise, 21 U.S.C. § 848(e)(1)(A), the jury was specifically instructed that it could find that such an enterprise existed even if the "person or persons" operating it were "not necessarily the defendant[]." J.A. 221; *compare* 21 U.S.C. § 848(a), (c) (A person may be liable for "a continuing criminal enterprise" if he "occupies a position of organizer, a supervisory position, or any other position of management" in it.), *with id.* § 848(e)(1)(A) ("Any person engaging in *or working in furtherance of* a continuing criminal enterprise" or who commits other drug offenses *and* who "intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual" may be liable for CCE murder.) (emphasis added).[6]

---

[6] Proving that the murder took place in furtherance of a continuing criminal enterprise is just one path by which the Government may prove CCE murder. 21 U.S.C. 848(e)(1)(A). An equally viable option—not taken in this case—would have dispensed with any need to show the existence of a "continuing criminal enterprise" *at all*, so long as the defendant committed the murder while "engaging in an offense punishable under section 841(b)(1)(A) * * * [or] section 960(b)(1)" of Title 21. *Id.* The penalties for *those* offenses were, in fact, changed by the Fair Sentencing Act, such that certain drug crimes that might have validly served as CCE murder predicates before the Fair Sentencing Act would no longer do so today. *See* Fair Sentencing Act § 2, 124 Stat. at 2372; *Snow*, 967 F.3d at 564–565. Other courts have held that CCE murder is still not a "covered offense" even when the charged predicate drug offense could no longer serve as a valid predicate today, because the penalties for CCE murder remain unchanged. *Snow*, 967 F.3d at 564–565; *Roane*, 51 F.4th at 546–551. However,

Accordingly, nothing about Smith's CCE-murder charge or even the predicate continuing criminal enterprise depended on proving distribution of any particular amount of crack cocaine. To that same point, in defining the CCE predicate for Smith's CCE murder charge, the jury was explicitly instructed that "the government *need not* prove that the continuing criminal enterprise was responsible for the distribution of *any* particular or minimum amount of crack as required for" the independently charged CCE murder offense. J.A. 221 (emphases added).

In short, no statutory penalties were changed for either (1) Smith's CCE murder charge, or (2) the predicate continuing criminal conspiracy charge, and the same conviction could be obtained today based on the same conduct. For that reason, even under Smith's own argument, his murder conviction is not eligible for First Step Act relief.

**2**

Smith next argues that, because the district court found that two of Smith's convictions *were* covered offenses, it had authority to impose a new sentence for all convictions because they were part of a single "sentencing package." *Cf. United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) ("[W]hen a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan, and that if some counts are

---

we need not decide that question here because the relevant predicate for Smith was the existence of a continuing criminal conspiracy which could still be charged today based on the same underlying drug felonies. *See* J.A. 95 (indictment); J.A. 221 (jury instructions).

vacated, the judge should be free to review the efficacy of what remains in light of the original plan[.]").

Courts have reached different conclusions about whether the First Step Act vests district courts with this authority. *Compare United States v. Hudson*, 967 F.3d 605, 610–611 (7th Cir. 2020) (holding that the First Step Act confers "discretion to reduce a single, aggregate sentence that includes covered and non-covered offenses"), *and United States v. Richardson*, 96 F.4th 659, 666–667 (4th Cir. 2024) (same), *with United States v. Gladney*, 44 F.4th 1253, 1262 (10th Cir. 2022) ("[T]he First Step Act prohibits a district court from reducing the sentence on a non-covered offense[.]").

We need not decide whether the First Step Act authorizes resentencing for covered and non-covered convictions alike when a single sentencing package is imposed. That is because Smith's covered drug distribution conspiracy and RICO conspiracy convictions were *not* part of a "single package" with his remaining convictions. Smith was sentenced to life without parole on his D.C. convictions under a wholly different legal scheme from that governing his federal convictions and sentences. *Smith*, 2022 WL 10449599, at *4; Presentence Investigation Report ("PSR") ¶¶ 273–287. Smith's crime-of-violence convictions, meanwhile, were statutorily required to run consecutively to his sentences on all other convictions. *See* 18 U.S.C. § 924(c)(1)(D). At the time Smith's sentence was imposed, the then-mandatory Sentencing Guidelines required the district court to impose a life sentence for his CCE-murder convictions. PSR ¶¶ 206–288. Given all of that, Smith's sentences for drug distribution conspiracy and RICO conspiracy were not packaged with his other sentences, and the district court correctly concluded that it lacked the statutory authority to reduce Smith's sentence on any convictions except for his two covered offenses.

**3**

Finally, Smith argues that the district court erred in declining to exercise its discretion to resentence him on his covered offenses. Because the district court addressed Smith's arguments and logically explained its decision, its ruling falls within its wide range of discretion.

To start, the First Step Act is explicit that "[n]othing in [it] * * * shall be construed to require a court to reduce any sentence pursuant to [the Act]." 21 U.S.C. § 841 note (Application of Fair Sentencing Act). That provision "confers particular discretion" on district courts, in addition to the already wide discretion ordinarily given sentencing judges. *Concepcion*, 597 U.S. at 501. Though "district courts bear the standard obligation to explain their decisions and demonstrate that they considered the parties' arguments[,] * * * the First Step Act leaves much to the judge's own professional judgment." *Id.* at 502 (formatting modified). Accordingly, absent legal error, our review is not "overly searching." *Id* at 485, 501.

Here, the district court addressed Smith's arguments for resentencing at length in a well-reasoned written opinion. *Smith*, 2022 WL 10449599, at *13–15. The court explained that it would not resentence Smith on his covered convictions for four reasons: "(1) [the] seriousness of [Smith's] offense conduct; (2) [Smith's] terrible behavioral record while incarcerated; (3) [the] irrelevance of the sentences on [the First-Step-Act-eligible] Counts 1 and 3 to the sentence [Smith] is actually serving [given his several concurrent life sentences]; and (4) [the] strong practice against the issuance of advisory opinions * * * ." *Id.* at *15; *see id.* at *14 (discussing Smith's record in prison). This detailed statement of reasons easily satisfies our deferential review.

Smith argues that the district court abused its discretion because the life sentence imposed for his drug distribution conspiracy charge exceeds the maximum sentence that could be imposed for the same offense today under current law. Smith Opening Br. 37–39. In support of this argument, he cites a 2021 Fourth Circuit decision holding that "district courts abuse their discretion in letting stand a sentence of imprisonment that exceeds the statutory maximum established by the Fair Sentencing Act." *United States v. Collington*, 995 F.3d 347, 356 (4th Cir. 2021).

The Fourth Circuit has since disavowed that holding as "untenable" given the narrow role for appellate review prescribed by the Supreme Court in *Concepcion v. United States*, 597 U.S. 481 (2022). *See United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023) (Under *Concepcion*'s narrow standard for appellate intervention, "*Collington*'s holding that a district court abuses its discretion by not reducing a sentence to the statutory maximum established by the Fair Sentencing Act is untenable."). That is unsurprising because *Collington*'s *per se* rule requiring the reduction of all sentences for statutory penalties modified by the Fair Sentencing Act is at war with that Act's explicit statement that it should not "be construed to require a court to reduce any sentence pursuant to [the Act]." *See* 21 U.S.C. § 841 note (Application of the Fair Sentencing Act). Accordingly, the fact that Smith's sentence for drug distribution conspiracy exceeds what could be imposed under current law does not by itself mean that the district court reversibly erred in declining to reduce it.

Smith also takes issue with the district court's statements about the "irrelevance of the sentences on [Smith's covered convictions] * * * to the sentence [Smith] is actually serving," and the "strong practice against the issuance of advisory opinions." *Smith*, 2022 WL 10449599, at *15. We agree with

Smith that nothing *precluded* the district court from reducing Smith's sentence on his two covered offenses even absent any immediate likelihood that the change would result in an earlier release from custody. But it was not off limits for the district court to consider, in exercising its discretion, that a sentence reduction on Smith's covered offenses would do him little good given his other convictions and sentences. In any event, the district court also based its decision at least in part on the seriousness of Smith's offense conduct and his behavioral record while incarcerated—findings Smith does not challenge on appeal.

Smith argues that the district court's emphasis on the "advisory" nature of any opinion was especially egregious because the First Step Act bars courts from entertaining resentencing motions "if a previous motion * * * to reduce the sentence was, after the date of enactment of th[e] Act, denied after a complete review of the motion on the merits." 21 U.S.C. § 841 note (Application of the Fair Sentencing Act). Smith worries that, even if future legal developments make a reduced sentence on his covered offenses relevant to his custodial term, he will be barred from seeking relief on his covered offenses.

Yet it may help, not hurt, Smith that the district court denied relief at least in part because it believed addressing such relief would involve an advisory opinion. *Smith*, 2022 WL 10449599, at *15. Should Smith's other convictions and sentences change such that First Step Act relief might actually help him, Smith can argue that his first motion did not receive "complete review * * * on the merits" and that the bar on successive motions should therefore not apply. 21 U.S.C. § 841 note (Application of Fair Sentencing Act). We need not resolve here the merits of such an argument because, even if the advisory-opinion statement were a misstep, the district court acted well within its discretion in denying resentencing

as to Smith's covered offenses for all the other reasons it offered.

## V

Because Smith's CCE-murder convictions involved the intentional use of force against others, they qualify as crimes of violence under Section 924(c)'s elements clause. We accordingly affirm denial of Smith's Section 2255 petition. We also affirm the district court's denial of resentencing under the First Step Act because Smith was not eligible for resentencing as to most counts, and the district court reasonably explained its denial of resentencing as to the eligible counts.

With the agreement of all parties, we remand to the district court for the limited purpose of entering a revised judgment and conviction order that reflects this court's prior vacatur of Smith's felony-murder and attempted-armed-robbery convictions, which were vacated on direct appeal. *See Sumler*, 136 F.3d at 189 n.1 (D.C. Cir. 1998); Gov't Br. 3 n.1.

*So ordered.*